UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

KENNETH CURRY, RICARDO MAZZITELLI,
JACQUELINE BROWN PILGRIM, on behalf of
themselves and others similarly situated,

                Plaintiffs,

    -against-

P&G AUDITORS AND CONSULTANTS, LLC; GRC
SOLUTIONS, LLC; PGX, LLC; AND APPLE
BANCORP, INC. d/b/a APPLE BANK FOR SAVINGS,

                Defendants.

-------------------------------------------------------------------- x

Case No. 20-cv-06985 (LTS)(SLC)

 

**MEMORANDUM OF LAW OF DEFENDANT APPLE BANK FOR SAVINGS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP**
150 East 42nd Street, Floor 19
New York, New York 10017
(212) 907-9600

*Attorneys for Defendant*
*Apple Bancorp, Inc. d/b/a Apple Bank for Savings*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ........................................................................................................ 4

ARGUMENT .............................................................................................................. 9

I.  APPLE BANK IS NOT PLAINTIFFS' EMPLOYER OR JOINT EMPLOYER
    UNDER THE FLSA OR NYLL ..................................................................... 9

    A.  Apple Bank Lacked Formal Control Over Plaintiffs ........................... 11

        1.  Apple Bank Did Not Hire Or Fire Plaintiffs Or Other GRC
        Employees .................................................................................. 11

        2.  Apple Bank Did Not Supervise Or Control Schedules Or Work
        Conditions Of Plaintiffs Or Other GRC Employees .................. 12

        3.  Apple Bank Did Not Determine The Rate Or Method Of Payment To
        Plaintiffs Or Other GRC Employees .......................................... 15

        4.  Apple Bank Did Not Maintain Plaintiffs' or Other GRC Employees'
        Employment Records .................................................................. 16

    B.  Apple Bank Lacked Functional Control Over Plaintiffs ...................... 16

        1.  Plaintiffs' And Other GRC Employees' Use Of Apple Bank Systems At
        The Bank Was Part And Parcel Of The Type Of Audit And Review
        They Were Engaged To Perform And Not Suggestive Of Any Degree
        Of Control .................................................................................. 16

        2.  Plaintiffs Belonged To An Organization That Could Shift As A Unit
        From One Putative Joint Employer To Another ......................... 17

        3.  Work As On The Project Is Typically Outsourced To Maintain
        Independence And Integrity Of The Review Process .................. 18

        4.  Responsibility Could Not Pass From One Vendor to Another Without
        Material Change .......................................................................... 19

5.  Apple Bank Did Not Supervise Plaintiffs Or Other Employees Of GRC ....................................................................................................20

6.  The Nature Of The Work Performed And The Time Constraints Mandated By The FDIC And NYSDFS Impacted The Amount Of Time Devoted To The Project...................................................................20

II.  PLAINTIFFS' FLSA CLAIMS ARE ALSO TIME-BARRED FOR LACK OF WILLFULNESS AND CERTAIN NYLL CLAIMS ALSO FAIL ..................................21

CONCLUSION...................................................................................................25

662077_1/00452-0209

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Carter v. Dutchess Cnty. Coll.*,
   735 F.2d 8 (2d Cir. 1984) ..................................................................................................10

*Clarke v. JPMorgan Chase Bank, N.A.*,
   No. 08 CIV. 2400 (CM) (DCF), 2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) ...................22

*In re Domino's Pizza Inc.*,
   No. 16-CV-2492(AJN) (KNF), 2018 WL 4757944 (S.D.N.Y. Sept. 30, 2018) .....................16

*Godlewska v. HDA*,
   916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom., Godlewska v. Human Dev.*
   *Ass'n, Inc.,* 561 F. App'x 108 (2d Cir. 2014) ........................................................ 12-13, 18, 20

*Goodman v. Port Auth. of New York & New Jersey*,
   850 F. Supp. 2d 363 (S.D.N.Y. 2012) ...................................................................................22

*Gustafson v. Bell Atl. Corp.*,
   171 F. Supp. 2d 311 (S.D.N.Y. 2001) ...................................................................................23

*Hart v. Rick's Cabaret Int'l*,
   967 F. Supp. 2d 901 (S.D.N.Y. 2013) ..........................................................................9, 10, 11

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999) ............................................................................................9, 16

*Holmes v. Air Line Pilots Ass'n, Int'l*,
   745 F. Supp. 2d 176 (E.D.N.Y. 2010) ...................................................................................25

*Hugee v. SJC Grp., Inc.*,
   No. 13 CIV. 0423 (GBD), 2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013) .................14, 16, 18

*Jean-Louis v. Metro. Cable Commc'ns, Inc.*,
   838 F. Supp. 2d 111 (S.D.N.Y. 2011) .......................................................................... *passim*

*Lopez v. Acme Am. Envtl. Co. Inc.*,
   No. 12 Civ. 511(WHP), 2012 WL 6062501 (S.D.N.Y. Dec. 6, 2012) ...............................9, 10

*Martin v. Sprint United Mgmt. Co.*,
   273 F. Supp. 3d 404 (S.D.N.Y. 2017) ...................................................................................10

*McLaughlin v. Richland Shoe, Co.*,
   486 U.S. 128 (1988) ..............................................................................................................22

iii

*McLean v. Garage Mgmt. Corp.*,
 No. 09 CIV. 9325 (DLC), 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012) ........................22, 25

*Parada v. Banco Indus. De Venezuela, C.A.*,
 753 F.3d 62 (2d Cir. 2014)..............................................................................................22

*Saleem v. Corp. Transp. Grp., Ltd.*,
 854 F.3d 131 (2d Cir. 2017)............................................................................................15

*Thomas v. River Greene Constr. Grp. LLC*,
 No. 17 CIV. 6954 (PAE), 2018 WL 6528493 (S.D.N.Y. Dec. 11, 2018) ...............................10

*Toles v. Schillaci*,
 No. 04-CV-6126, 2006 WL 4536000 (W.D.N.Y. Sept. 29, 2006),
 *report and recommendation adopted*, No. 04-CV-6126, 2007 WL 709330
 (W.D.N.Y. Mar. 5, 2007)..................................................................................................24

*Watkins v. First Student, Inc.*,
 No. 17-CV-1519 (CS), 2018 WL 1135480 (S.D.N.Y. Feb. 28, 2018) ...................................22

*Zheng v. Liberty Apparel Co. Inc.*,
 355 F.3d 61 (2d Cir. 2003)....................................................................................... *passim*

**Rules & Statutes**

29 U.S.C. § 207(a)(1)............................................................................................................9

29 U.S.C. § 255(a) ..........................................................................................................4, 21

31 CFR § 1020.210 ...............................................................................................................7

31 U.S.C. § 5318 ...................................................................................................................7

N.Y. Lab. Law § 195 (1).......................................................................................................25

N.Y. Lab. Law § 195 (3).......................................................................................................25

N.Y. Lab. Law § 198 (1)(b)...................................................................................................25

N.Y. Lab. Law § 198 (1)(d)...................................................................................................25

iv

## PRELIMINARY STATEMENT

Defendant Apple Bank for Savings ("Apple Bank" or the "Bank"), sued herein as Apple Bancorp, Inc. d/b/a Apple Bank for Savings, submits this Memorandum of Law in support of its Motion for Summary Judgment against Plaintiffs Kenneth Curry ("Curry"), Ricardo Mazzitelli ("Mazzitelli"), and Jacqueline Brown Pilgrim ("Pilgrim," collectively "Plaintiffs"), and others similarly situated.

Plaintiffs assert claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") against GRC Solutions, LLC ("GRC"), the entity which employed them, GRC's affiliates, Defendants P&G Auditors and Consultants, LLC ("P&G") and PGX, LLC ("PGX"), and, inexplicably, Apple Bank. Why "inexplicably"?  Because GRC and its employees were engaged by Apple Bank, under Federal and New York State authority, to independently test and validate Apple Bank's "suspicious activity monitoring system," and  the Bank's Anti-Money Laundering and Bank Secrecy Act Compliance Program, to determine whether suspicious activity involving any accounts or transactions were properly identified and reported by the Bank in accordance with applicable suspicious activity reporting requirements. GRC, an independent third party approved by Federal and New York State regulators, was engaged to undertake this testing and validation work, using its employees, because Apple Bank and the Bank's employees were precluded by the Federal Deposit Insurance Corporation and the New York State Department of Financial Services from testing and validating the Bank's own monitoring system and Compliance Program.

There can be no genuine dispute that this is not a case of subterfuge, where Apple Bank could be perceived as "contracting out" its responsibilities, or shifting its burden, to GRC; rather, the Bank was required by Federal and State agencies to engage GRC and its employees to perform

specific independent audit functions, in accordance with relevant regulations and the rules of the Office of Foreign Assets Control of the United States Department of the Treasury, to ensure, among other things, that the filtering criteria and thresholds of the Bank's suspicious activity monitoring system were appropriately detecting potentially suspicious activity.   All of the foregoing is clearly established by documentary evidence from the Federal Deposit Insurance Corporation and the New York State Department of Financial Services, fully referred to below.

The contractual documents between Apple Bank and GRC, also fully referred to below, are in accord.  Those documents confirm the following: GRC was engaged by the Bank for independent testing and monitoring of Apple Bank's Anti-Money Laundering and Bank Secrecy Act Compliance Program; GRC employed Certified Anti-Money Laundering Specialists across a broad spectrum of Anti-Money Laundering and Bank Secrecy Act activities; GRC, to undertake its work, required access to Apple Bank's information technology resources and systems; GRC billed Apple Bank; GRC estimated costs, including the hourly rates for GRC's data analysts, Bank Secrecy Act analysts, quality control employees, project manager, and managing director; and GRC described in detail the roles of each category of its employees, and estimated the duration of their field work and the hours to be worked by them.  The contractual documents, tendered by GRC to Apple Bank, also provide: "To maintain the level of independence, the Bank agrees not to engage in a discussion or make a potential offer of employment to an existing or former employee of GRC without the consent of [GRC].  Such a solicitation can have a severe impact on [GRC's] operations and compromise the integrity of the work."  These documents also provide that the basis for GRC's insistence on non-solicitation is "[t]o avoid the potential for (or the appearance of) any actual or potential conflict of interest (including, without limitation, lack of GRC Agent *independence*). . ." (emphasis added).  In furtherance of GRC's independent work, Apple Bank

2

was contractually obligated to provide GRC employees with access to the Bank's information technology resources (subject to their execution of Apple Bank's "Acceptable Use Policy") and, therefore, to make temporary office space at a Bank branch available to GRC employees at such times as they and GRC reasonably requested.  Of course, at times when they needed access after standard hours of operation, the Bank necessarily provided security to ensure the safety of these invitees.

Documentary evidence also demonstrates that the reality of Apple Bank's required engagement of GRC accorded with the intent of the Federal and New York State agencies, and with the contractual documents governing the relationship between the Bank and GRC. Among other things, emails from GRC to Apple Bank during the course of GRC's engagement consistently show that GRC would inform Apple Bank which GRC employees needed "systems access" for their work, and to what Bank programs they needed access to do their independent testing and validation work.  GRC would also inform Apple Bank when GRC employees were no longer working for GRC on the engagement with the Bank so their access to Bank systems could be deactivated.  GRC controlled when its employees would be "on-boarded" to, or "off-boarded" from, the Apple Bank engagement, based on an often intermittent schedule determined by GRC.

Plaintiffs' claims, to the extent asserted against Apple Bank, fail as a matter of law because the Bank was neither an employer nor a "joint employer" of Plaintiffs. Accordingly, the Bank was not subject to either FLSA or NYLL obligations with respect to them.

Plaintiffs' claims under the FLSA, at least as asserted against Apple Bank, are also time-barred.  Curry completed his work on the project by August 26, 2018, Mazzitelli completed his work by February 2018, and Pilgrim completed her work by June 11, 2018.  The FLSA provides a two-year statute of limitations for actions to enforce its provisions, "except that a cause of action

3

arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Plaintiffs' Complaint was filed with this Court on August 27, 2020. Plaintiffs may or may not be able to prove willfulness against GRC, P&G and PGX; but documentary evidence precludes Plaintiffs from doing so against Apple Bank. Regarding the three-year statute of limitations for willful FLSA violations, a plaintiff bears the burden of proof on the issue of willfulness, and must establish that an employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. Apple Bank respectfully submits that the facts and circumstances here preclude Plaintiffs, as to the Bank, from extending the FLSA's two-year statute of limitations.

## BACKGROUND

By a Consent Order dated December 16, 2015 ("Consent Order"), the Federal Deposit Insurance Corporation ("FDIC") required Apple Bank, regarding its Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") Compliance Program, in accordance with applicable BSA and AML statutory and regulatory requirements, to "engage a qualified firm acceptable to the Regional Director to," among other things, (1) "perform a validation of the Bank's suspicious activity monitoring system, which shall include testing of the effectiveness of established filtering criteria and thresholds and ensuring that the system appropriately detects potentially suspicious activity," (2) "conduct a review of all accounts and transaction activity for the time period beginning October 1, 2014 through the effective date of this ORDER . . . to determine whether suspicious activity involving any accounts or transactions within or through the Bank was properly identified and reported in accordance with the applicable suspicious activity reporting requirements ('Look Back Review')," and (3) upon completion of the Look Back Review, "prepare

4

any additional CTRs and SARs necessary based upon the review."  (Affidavit of Dean G. Yuzek, sworn to on December 3, 2020 ("Yuzek Aff."), Ex. A at pp. 7-8, ¶¶ 4, 6(a) and (b).)

Similarly, by a signed Memorandum of Understanding dated January 29, 2016 ("MOU"), the New York State Department of Financial Services ("NYSDFS") required Apple Bank, regarding its BSA and AML Compliance Program, in accordance with the relevant regulations of the NYSDFS, as well as the rules and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), to "engage a qualified firm acceptable to the Superintendent to," among other things, (1) "perform a validation of the Bank's suspicious activity monitoring system, which shall include testing of the effectiveness of established filtering criteria and thresholds and ensuring that the system appropriately detects potentially suspicious activity" and (2) "conduct a review of all accounts and transaction activity for the time period beginning October 1, 2014 through December 16, 2015 . . . to determine whether suspicious activity involving any accounts or transactions within or through the Bank was properly identified and reported in accordance with the applicable suspicious activity reporting requirements (the 'Look Back Review'), and (3) upon completion of the Look Back Review, "prepare any additional CTRs and SARs necessary based upon the review."  (*Id.,* Ex. B at pp. 6-7, ¶¶ 4, 6(a) and (b).)

As directed by the FDIC and NYSDFS, Apple Bank engaged such a "qualified firm," GRC, to, independently, test, monitor and validate Apple Bank's Compliance Program, including the Bank's suspicious activity monitoring system (the "Project").  (*Id.,* Exs. A. at pp. 7-8 and B. at pp. 6-7.)  Apple Bank and GRC entered into comprehensive contractual documents—all tendered by GRC to Apple Bank—which described GRC's services and defined the scope of its independent work.  (*Id.,* Exs. C-H.)  The contractual documents, consisting of proposals outlining GRC's

Statements of Work and a fully executed Master Services Agreement ("MSA"),[1] provide, *inter alia*, that Apple Bank engaged GRC for *independent* validation of key BSA/AML/OFAC components in its operation and for *independent* transaction look back reviews (*Id.*, Exs. F at p. 4, "Statement of Need" and G at p. 3, "Statement Of Work"); and, that GRC "*employs* Certified Anti-Money Laundering Specialists (CAMS), Operations, and other subject matter experts across a broad spectrum of BSA/AML/OFAC activities. . . ." (*Id.*, Exs. D at p. 3 (3rd paragraph), E at p. 3 (3rd paragraph), and F at p. 3 (3rd paragraph)) (emphasis added).  The MSA further states "Apple Bank has *no responsibility for the supervision and/or monitoring* of GRC Agents to ensure their compliance with MSA and SOW terms and conditions." (*Id.*, Ex. C at p. 3, ¶ 2 "Privacy and Confidentiality" (last sentence)) (emphasis added).  These contractual documents also detail GRC's estimates of cost, hourly rates for its data analysts, BSA analysts, quality control employees, project manager, and managing director, with GRC's descriptions of the roles of each category of its employees, and GRC's estimated hours to be worked by its various employees. (*Id.*, Exs. D at pp. 5-6, and G at pp. 7-11.)

These documents further provide that, for GRC to undertake this and related work, GRC must have "access to Bank systems" and "internal assessments." (*Id.,* Ex. E at p. 4, "Scope and Activity Guidelines," and F at p. 6; *see also id.,* Ex. G at p. 4, ¶ 2, "Phase I, Project Management.") They also address the manner in which GRC would bill the Bank, including by advance  payment of a percentage of GRC's estimated fees followed by bills for the balance of such fees based on hours incurred, plus other costs including, but not limited to, an allocated administrative overhead factor on total gross fees.  (*See  id.,* Exs. D at p. 6, F at p. 7, G at p. 11, and H at p. 3.)

---

[1] The MSA is dated March 27, 2018, but was entered into by Apple Bank and GRC to "supplement previous Statements of Work ('SOWs') in which GRC was engaged to perform certain services..." (Yuzek Aff., Ex. C at p. 2 (second WHEREAS clause).)  (Exhibits C and G have unnumbered pages.  We deem the first "title" page of those Exhibits, following the lettered exhibit page tab, to be p. 1.)

Notably, the contractual documents provide as follows: "*To maintain the required level of independence*, the Bank agrees not to engage in a discussion or make a potential offer of employment to an existing or former employee of GRC without the specific consent of [GRC]. Such a solicitation can have a severe impact on [GRC's] operation and compromise the integrity of the work." (*Id.,* Ex. D at p. 7 (3rd paragraph) (emphasis added); *see also* Exs. F at p. 8 (1st paragraph) and G at p. 11 (final paragraph)). The non-solicitation provision of the MSA is to the same effect, and provides that GRC's insistence on non-solicitation is "[t]o avoid the potential for (or the appearance of) any actual or potential conflict of interest (including, without limitation, *lack of GRC Agent independence*") (*Id.,* Ex. C at p. 3, ¶ 4, "Non-Solicitation") (emphasis added).

In conformance with the FDIC Consent Order, the NYSDFS MOU, Federal regulations relating to testing for compliance with AML program requirements (*see, e.g.,* 31 CFR § 1020.210 and 31 U.S.C. § 5318), and the contractual documents between the Bank and GRC, Apple Bank neither supervised nor controlled the work of GRC employees. GRC and/or its affiliates recruited and hired Plaintiffs, and other individuals, to work for GRC on the Project it was engaged to conduct. (ECF No. 1, ¶¶ 49, 89-97, 110-13, 120-23.) Regarding the GRC employees, Apple Bank did not: pay them, provide pay statements, issue any 1099s or W2s, prepare or retain records of employment, maintain personnel files, have input into how their employment would be classified, or have any involvement regarding agreements between them and GRC or its affiliates. (Affidavit of Susan Goro, sworn to on December 2, 2020 ("Goro Aff."), ¶¶ 6-7 and ECF No. 1, ¶¶ 92, 100, 104, 112, 121.)

GRC employees were frequently "on-boarded" and "off-boarded" from the Project by GRC, often without Apple Bank being immediately advised, as the retention of GRC employees was subject to GRC's control. (*See* Yuzek Aff, Exs. I and J.) The contractual documents between

7

Apple Bank and GRC necessarily required the Bank to grant GRC employees access to "Bank systems" to test the effectiveness of the Bank's suspicious activity monitoring system and perform their independent AML and BSA-related validations, reviews, and risk assessments.  (*Id.,* Exs. E at p. 4, "Scope and Activity Guidelines" and F at p. 6; *see also id.,* Ex. G at p. 4, ¶ 2, "Phase I, Project Management" and Goro Aff., ¶ 3.)  As demonstrated by email correspondence over the course of GRC's engagement,  *GRC* would inform Apple Bank which GRC employees needed "systems access" for their work, and to what Bank programs they needed access to perform their independent testing and review work.  (Yuzek Aff., Ex. I.)  Similarly, *GRC* would inform Apple Bank when GRC employees were no longer working on the Project, and would request deactivation of their access to Bank systems.  (*Id.*, Ex. J.)

To enable GRC employees to access the Bank's information technology resources and systems, and to facilitate their work, Apple Bank's Senior Vice President for Corporate Real Estate provided them, at a Bank branch, with temporary work stations, which were partitioned from the offices and work stations of Apple Bank employees.  (Affidavit of Mitchell Jacobs, sworn to on December 1, 2020 ("Jacobs Aff."), ¶ 4.)  At times, when GRC employees needed access after the Bank's standard hours of operation, the Bank necessarily provided security to ensure the safety of these invitees.  (*Id*., ¶ 5.)

Moreover, before GRC employees were permitted to use the Bank's premises to access Bank systems and information technology resources in furtherance of their need to test the Bank's suspicious activity monitoring system and other systems relating to their independent assessment of the Bank's AML, BSA and OFAC procedures, GRC employees, like all personnel affiliated with third parties, were required to sign the Bank's Acceptable Use Policy.  (Goro Aff., ¶ 4; s*ee also* Yuzek Aff. Ex. K, Acceptable Use Policy signed by Mazzitelli, as an employee of GRC.)

On August 27, 2020, Plaintiffs brought this action against GRC, P&G, PGX, and Apple Bank, more than two years after each of them completed their work on the Project.  (ECF No. 1.) According to the Complaint, PGX, GRC's affiliate, terminated Curry from the Project by August 26, 2018, GRC terminated Mazzitelli from the Project in February 2018, and Pilgrim resigned from the Project by June 11, 2018.  (*Id.*, ¶¶ 108, 116, and 127.)

## ARGUMENT

### I.

### APPLE BANK IS NOT PLAINTIFFS' EMPLOYER OR JOINT EMPLOYER UNDER THE FLSA OR NYLL

The FLSA provides "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Only an "employer" can be liable for failing to pay "time and a half" rates for overtime.  *Jean-Louis v. Metro. Cable Commc'ns, Inc.,* 838 F. Supp. 2d 111, 120 (S.D.N.Y. 2011).  In analyzing whether an entity is a joint employer under the FLSA, "[t]he overarching concern is whether the alleged employer possessed the power to control the workers in question."  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

Courts in the Second Circuit consider both formal and functional control factors to determine whether, in light of the economic reality, an alleged joint employer exerted sufficient control over the workers' terms and conditions of employment to be deemed their employer.  *Zheng*, 355 F.3d at 67-69; *Hart v. Rick's Cabaret Int'l*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013).  The formal and functional factors overlap, and no one factor is dispositive.  *Lopez v. Acme Am. Envtl. Co. Inc.*, No. 12 Civ. 511(WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012).

9

Courts routinely apply the same factors to assess joint employment status under the New York Labor Law as well. *See Hart*, 967 F. Supp. 2d at 940; *Lopez*, 2012 WL 6062501, at *3 (definitions of "employer" under the FLSA and NYLL are "coextensive" and applying same formal and functional control factors to both claims); *Martin v. Sprint United Mgmt. Co.,* 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017) (courts in this district "regularly apply the same tests to determine whether entities were joint employers under NYLL and the FLSA"); *Thomas v. River Greene Constr. Grp. LLC*, No. 17 CIV. 6954 (PAE), 2018 WL 6528493, at *5 (S.D.N.Y. Dec. 11, 2018) (citations omitted) (District Courts in this Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA").

In the Second Circuit, Courts first analyze "formal control" and consider whether the putative joint employer: (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Carter v. Dutchess Cnty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).

If the putative joint employer lacks formal control, Courts then consider "functional control" by analyzing six non-exclusive factors: (1) whether the purported joint employer's premises and equipment were used for plaintiffs' work; (2) whether plaintiffs belonged to an organization that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to the purported joint employer's process of production; (4) whether responsibility under the contracts could pass from one vendor to another without material changes; (5) the degree to which the purported joint employer supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the purported joint employer. *Zheng,* 355 F.3d at 72. This analysis of functional

control, known as the "economic reality test," is "manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Id.* at 76.  It is intended as an examination of the totality of the circumstances, and to grant summary judgment in favor of a defendant, a court "need not decide that *every* factor weighs against joint employment." *Id.* at 76-77 (emphasis in original)*; see also Jean-Louis*, 838 F. Supp. 2d at 119.  A court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 355 F.3d at 71-72.  Here, application of these formal and functional control factors compels the conclusion that Apple Bank is not a joint employer as a matter of law.[2]

A.      **Apple Bank Lacked Formal Control Over Plaintiffs**

   1.      *Apple Bank Did Not Hire Or Fire Plaintiffs Or Other GRC Employees*

Apple Bank did not hire Plaintiffs, or other individuals, to work on the Project.  (Goro Aff., ¶ 5; *see also* ECF No. 1 at ¶¶ 49, 89-91, 110-12, 120-21.)  Pursuant to the Consent Order and MOU, Apple Bank was required to "engage a qualified firm" to perform an *independent* review of the Bank's suspicious activity monitoring system, test its AML and BSA Compliance Program, review accounts and transaction histories, and prepare suspicious activity reports and currency transaction reports as necessary.  (*See* Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.)  Complying with these directives, Apple Bank engaged GRC, which "employs Certified Anti-Money Laundering Specialists…and other subject matter experts across a broad spectrum of BSA/AML/OFAC activities. . . ."  (*Id.,* Exs. D at p. 3 (3rd paragraph), E at p. 3 (3rd paragraph), and F at p. 3 (3rd paragraph).)  Apple Bank was uninvolved in the hiring process.  (Goro Aff, ¶ 5.)

---

[2] In the event GRC were able to prove that Plaintiffs were independent contractors, as opposed to employees of GRC, Apple Bank would still be entitled to summary judgment as independent contractors are "outside the reach" of the FLSA and NYLL.  *See Hart.*, 967 F. Supp. 2d at  911.

GRC and/or its affiliates recruited and hired Plaintiffs, and others, to work for GRC on the Project for which it was engaged. (*Id.; see also* ECF No. 1, ¶¶ 49, 89-97, 110-13, 120-23.)

Apple Bank was also uninvolved in the termination process.  Rather,  GRC would routinely inform Apple Bank when GRC employees were no longer working on the Project and that their access to Bank systems should be deactivated.  (Yuzek Aff., Ex. J.)  Apple Bank did not have the power to hire or fire GRC employees working on the Project. (Goro Aff., ¶ 5.)  Apple Bank performed the ministerial task of deactivating access in accordance with GRC's instructions.[3]  (*Id; see also* Yuzek Aff., Ex. J.)

2.    *Apple Bank Did Not Supervise Or Control Schedules Or Work Conditions Of Plaintiffs Or Other GRC Employees*

The Consent Order and MOU address time-sensitive obligations.  (*See* Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.)  GRC, as the "qualified firm" engaged to comply with them, therefore had Project-related deadlines to meet.  GRC was aware of its role as an independent third-party auditor as mandated by the FDIC and NYSDFS, and such time constraints.  (*Id.,* Exs. D at p. 6, "Timeline" and G at p. 11, "Estimated Fees, Expenses & Timeline.")

Plaintiffs allege Apple Bank "demanded that Plaintiffs and members of the collective and class work in excess of 65 hours per week in order to complete a bank project within a particular timeframe."  (ECF. No. 1, ¶ 77.)  This allegation, although false, is immaterial.  "Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time." *Godlewska v. HDA*, 916 F. Supp. 2d 246, 259 (E.D.N.Y. 2013), *aff'd sub nom., Godlewska v. Human Dev. Ass'n, Inc.,* 561 F. App'x 108 (2d Cir.

---

[3] Even if Apple Bank had authority to revoke authorization unilaterally, this would not have prevented such an individual from working for GRC on another project and, therefore, is not akin to the requisite "power to fire" signifying control. *See Jean-Louis*, 838 F. Supp. 2d at 123-25 (while a putative employer could "de-authorize" a worker from performing services, this  was not the equivalent of the "power to fire" where the worker was not precluded from performing other work for the subcontracting employer).

2014).  *See also Jean–Louis,* 838 F. Supp. 2d at 126 (rejecting plaintiff technicians' argument that defendant cable company controlled their work schedules by dictating "time windows" for installation jobs, where subcontractor, rather than defendant, "decides which technicians will work on which job and whether a technician will work on any jobs in that period at all").  Apple Bank neither controlled nor dictated the days or number of hours GRC employees worked to meet their deadlines.  (Goro Aff., ¶ 8.)  GRC, not Apple Bank, determined the number of hours each GRC employee worked, and the Project roles of each GRC employee, as reflected in both contractual agreements and email communications between Apple Bank and GRC.  These documents establish that GRC designed the plan for implementing the Project, including the estimated hours GRC expected its employees to work, and designated the specific number of analysts, managers and directors needed to complete the Project.  (*See* Yuzek Aff., Exs. D at pp. 5-6 and G at p. 7-11.) GRC's "Apple Bank Lookback Project Team" organization chart, which GRC shared with Apple Bank, reflects the individual employees GRC assigned to each Project management team.  (*Id.,* Ex. L.)  Moreover, the MSA expressly provides "Apple Bank has no responsibility for the supervision and/or monitoring of GRC Agents to ensure their compliance with MSA and SOW terms and conditions." (*Id.,* Ex. C at p. 3, ¶ 2 "Privacy and Confidentiality" (last sentence).)

Documentary evidence also shows that GRC employees did not consistently work on the Project throughout its duration, and establishes that GRC controlled the often intermittent periods of time they worked.  GRC employees routinely left and joined the Project throughout its duration, and GRC often notified Apple Bank only after-the-fact to "deactivate" the systems access of such GRC employees, or to "activate" their access so they could continue to test the Bank's suspicious activity monitoring system and independently review the Bank's AML and BSA Compliance Program.  (*Id*., Exs. I and J.)  GRC would notify Apple Bank that "New GRC Contractors" had

13

joined the Project.  (*Id*., Ex. I-3.)  GRC would also inform Apple Bank of the dates on which new GRC employees had joined the project, and "where we stand with systems access for our recent new joiners."  (*Id.,* Ex. I-2.)  Collectively, such documents demonstrate that Apple Bank did not possess or exercise control over how and when GRC deployed its employees regarding their work on the Project.

With respect to conditions of work environment, "the pertinent inquiry is whether the purported joint employer exercised control over the employee's day-to-day conditions of employment."  *Hugee v. SJC Grp., Inc.,* No. 13 CIV. 0423 (GBD), 2013 WL 4399226, at *6 (S.D.N.Y. Aug. 14, 2013) (citations omitted).  Plaintiffs' bald assertions that Apple Bank "set the parameters and instructions for Plaintiffs and members of the collective and class to perform their job, including, but not limited to, how to review the transactions the [Anti-Money Laundering investigators] and [Team Leaders] were assigned to inspect," is contradicted by the undisputed factual record.  (ECF No. 1, ¶ 80.)  Instead, as directed by the FDIC and NYSDFS, a third-party entity—GRC—was required to plan, implement and oversee the various stages of the *independent* Project and general workflow.  (Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.)  This is precisely what GRC committed to do in its contractual agreements with the Bank.  (Yuzek Aff., Exs. D at pp. 4-5, E at pp. 4-5, F at pp. 6-7, G at p. 3-6, and H at pp. 1-3.)

Apple Bank's requirement that Plaintiffs and others from GRC working on the Project sign the Bank's Acceptable Use Policy does not indicate any degree of control by Apple Bank over their work.  This requirement was incidental to Plaintiffs' work, as they needed access to Apple Bank systems and technology to perform their independent review of the Bank's Compliance Program, including its suspicious activity monitoring system.  (Yuzek Aff., Exs. E at p. 4 ,"Scope and Activity Guidelines," F at p. 6, G at p. 4, ¶ 2, "Phase I, Project Management," and Goro Aff.

at ¶ 3.)  Apple Bank required all personnel affiliated with third parties to sign its Acceptable Use Policy for security purposes. (Goro Aff., ¶ 4; *see also* Yuzek Aff., Exs. I-3 and K.)  The Second Circuit has rejected a similar argument.  *See Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 149 (2d Cir. 2017) (holding that standards of conduct manuals did not render plaintiffs employees, as defendants "wielded virtually no influence over other essential components of the business").

3.      *Apple Bank Did Not Determine The Rate Or Method Of Payment To Plaintiffs Or Other GRC Employees*

Apple Bank did not determine how Plaintiffs or other GRC employees would be classified. (Goro Aff., ¶ 7.)  Apple Bank had no input in classification decisions, and did not prepare or retain records of any employment or engagement agreements signed by Plaintiffs.  (*Id.* at ¶¶ 6-7 and ECF No. 1, ¶¶ 92, 100, 104, 112, 121.)  Apple Bank did not pay or provide pay statements to Plaintiffs or any GRC employees.  (Goro Aff., ¶ 7 and ECF No. 1, ¶¶ 97, 100, 113, 123)  Nor did Apple Bank issue any 1099's or W2's to Plaintiffs or any other GRC employees working on the Project. (Goro Aff., ¶ 7.)  GRC billed Apple Bank, including by advance payment of a percentage of GRC's estimated fees, followed by bills for the balance of such fees based on hours incurred, plus other costs, including, but not limited to, an allocated administrative overhead factor on total gross fees. (Yuzek Aff., Exs. D at p. 6, F at p. 7, and H at p. 3.)

Moreover, Apple Bank agreed to rates that were set by GRC.  (*Id.,* Exs. D at pp. 5-6 and G at p. 7, "Phase I Estimated Effort" and at p. 10, "Phase II Effort.")  Even if Apple Bank paid GRC those rates based on hours of work performed (plus other costs) and then GRC in turn paid Plaintiffs and its other employees in some manner based on those same rates, that does not equate to Apple Bank *setting* pay rates for GRC's employees working on the Project.  "To be sure, any company A that provides revenue to company B affects what company B pays its employees, but the test is whether a putative joint employer *determines* pay rates, not whether it *affects*

15

them." *Jean–Louis*, 838 F. Supp. at 129-30 (emphasis added).  There can be no dispute that Apple

Bank did not set the GRC employees' wages or pay such employees.  *See In re Domino's Pizza*

*Inc.,* No. 16-CV-2492(AJN) (KNF), 2018 WL 4757944, at *7 and *9 (S.D.N.Y. Sept. 30, 2018)

(concluding defendants were not joint employers as a matter of law because, *inter alia*, plaintiffs

could not prove defendants "either set Plaintiffs' wage rates or issued payments"); *cf. Herman v.*

*RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999) (affirming that appellant who signed payroll

checks, and had the authority to do so, qualified as an employer).

       4.     *Apple Bank Did Not Maintain Plaintiffs' Or Other GRC Employees' Employment*
             *Records*

Apple Bank did not "maintain[] Plaintiff[s'] employment records, which include an

employee's personnel files, time sheets, pay stubs, and government employment forms." *Hugee*,

2013 WL 4399226, at *7.  Apple Bank did not maintain any personnel files for Plaintiffs or other

GRC employees.  (Goro Aff., ¶ 6.)  Nor did the Bank maintain copies of any tax forms, paystubs, or

their agreements with GRC or related entities.  (*Id.*)

As *none* of the formal control factors is satisfied here, there is no genuine issue as to any

material fact that Apple Bank lacked "formal control" over Plaintiffs or other GRC employees.

   **B.**    **Apple Bank Lacked Functional Control Over Plaintiffs**

       1.     *Plaintiffs' And Other GRC Employees' Use Of Apple Bank Systems At The Bank*
             *Was Part And Parcel Of The Type Of Audit And Review They Were Engaged To*
             *Perform And Not Suggestive Of Any Degree Of Control*

The first functional control factor, which is "whether [the putative joint employer]'s

premises and equipment were used for the plaintiffs' work," *Zheng,* 355 F.3d at 72, weighs against

a finding that Apple Bank jointly employed Plaintiffs.  Plaintiffs' allegations that Apple Bank

provided Plaintiffs "with the materials needed to perform their jobs, including computers, office

space, [and] stationary" and that Plaintiffs "performed their work on APPLE BANK property" fall

16

far short of supporting a finding of joint employment. (ECF No. 1, ¶¶ 78 and 79.)  Plaintiffs ignore that the nature of the work to be performed for the Project necessarily required GRC to have "access to Bank systems" and "[i]nternal assessments."  (Yuzek Aff., Exs. E, at p. 4, "Scope and Activity Guidelines," and F at p. 6; *see also id.*, Ex. G at p. 4, ¶ 2, "Phase I, Project Management," and Goro Aff., ¶ 3.)

To enable GRC employees to perform their independent work, Apple Bank provided them, at an Apple Bank branch, with temporary workstations, which were partitioned from the offices and workstations of Apple Bank employees.  (Jacobs Aff., ¶ 4.)  At times, when GRC employees needed access after the Bank's standard hours of operation, the Bank necessarily provided security to ensure the safety of these invitees.  (*Id.*, ¶ 5.)  But "shared premises" are not "anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship)," just as they are consistent with GRC employees' performance of specific independent audit functions and review here.  *Zheng,* 355 F.3d at 72. Apple Bank was contractually *obligated* to provide GRC employees with access to its systems, and thus its information technology resources, to perform their agreed-upon scope of work.  (Yuzek Aff., Exs. E at p. 4, "Scope and Activity Guidelines," F at p. 6, and G at p. 4, ¶ 2, "Phase I, Project Management.")

2.     *Plaintiffs Belonged To An Organization That Could Shift As A Unit From One Putative Joint Employer To Another*

"[A] subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."  *Zheng,* 355 F.3d at 72.  Such is the case here.  Pursuant to the FDIC Consent Order and NYSDFS MOU, Apple Bank was required to "engage a qualified firm" that was "acceptable" to the Regional Director of the FDIC and to the Superintendent of the NYSDFS and, therefore, engaged GRC, which advertised

17

itself as "a trusted resource to *financial institutions* by providing consultative services to assess the efficiency of technology used by banks to monitor Customer Identification Program, Bank Secrecy Act, Anti-Money Laundering, Office of Foreign Assets Control program, and other risk-based regulations." (Yuzek Aff., Exs. A at pp. 7-8, B at pp. 6-7, D at p. 3, E at 3, and F at p. 3) (emphasis added). Thus, GRC, as it represented, serviced financial institutions other than Apple Bank, and its employees could work on projects for such other institutions. Although Plaintiffs may have, at times, worked solely on one project at a time, they were still able to shift to similar projects for other financial institutions; their *ability* to work with more than one client is key.

Moreover, as set forth above, GRC employees did not necessarily consistently work on the Project throughout its duration, and GRC controlled these intermittent periods of time they often worked. (Yuzek Aff., Exs. I and J.) Such intermittent scheduling while working on the Project shows that GRC employees had an ability to work for more than one client even during the course of Project, let alone before it began and after it ended.

3. *Work As On The Project Is Typically Outsourced To Maintain Independence And Integrity Of The Review Process*

The third factor for functional control requires a court to assess whether Plaintiffs "performed a discrete line-job that was integral to the purported joint employer's process of production." *Godlewska*, 916 F. Supp. 2d at 257. Courts have questioned whether this factor "translates well outside of the production line employment situation." *Id.* at 263 (citations omitted); *Hugee*, 2013 WL 4399226, at *9 (holding that the third factor was unsatisfied because plaintiff "was a service provider and did not perform a discrete line job"). To the extent this factor even applies here, Courts consider "industry custom and historical practice." *Zheng*, 355 F.3d at 73. The more customary a contracting practice, the less likely it is operating as a "mere subterfuge to avoid complying with labor laws." *Id.* It is common practice, under a Federal Regulatory and

Statutory framework, for financial institutions to engage third-party entities such as GRC to provide independent review and validation of BSA, AML and OFAC compliance systems.  (*See* ECF No. 19, ¶¶ 156-57.)  This is supported by the Federal and State directives mandating such independent testing.  (ECF No. 19, ¶¶ 50-51, 158-60; Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.)

       4.    *Responsibility Could Not Pass From One Vendor to Another Without Material Change*

Where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." *Zheng*, 355 F.3d at 74.  Here, Plaintiffs worked on the Bank Project only to the extent that GRC was engaged by the Bank—an indication that no joint employment relationship existed.  There is nothing to suggest Plaintiffs would continue working on Apple Bank-related issues after the engagement with GRC ended.  *See Jean–Louis,* 838 F.Supp.2d at 135 ("There is no evidence that Metro technicians would continue installing Time Warner cable if Time Warner severed its relationship with Metro…the undisputed evidence shows that, rather than hiring technicians, Time Warner hires contractors who hire technicians…").  Apple Bank was not permitted to "engage in a discussion or make a potential offer of employment to an existing or former employee of GRC" because such an offer of employment could "have a severe impact on [GRC's] operations and compromise the integrity of the work," and would therefore be "deemed as a material breach" of its agreement with GRC. (Yuzek Aff., Ex. D at p. 7 (3rd paragraph); *see also* Exs. C, at p. 3,  ¶ 4, "Non-Solicitation," F at p. 8 (1st paragraph), and G at p. 11 (final paragraph).)  Indeed, the Bank was prohibited from soliciting GRC employees under the prospect of extreme penalties being imposed on the Bank. (*Id.*)

5.      *Apple Bank Did Not Supervise Plaintiffs Or Other Employees Of GRC*

The inquiry under the fifth functional control factor is "'largely the same' as the inquiry under the second *Carter* [formal control] factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs." *Godlewska,* 916 F. Supp. 2d at 264 (quoting *Jean–Louis,* 838 F. Supp. 2d at 126 n. 7).  As discussed above, Apple Bank neither supervised the terms nor the conditions of Plaintiffs' employment or those of other GRC employees.  *See supra* pp. 12-15, Point I (A)(2).  Rather, in accordance with the express directives of the FDIC Consent Order and NYSDFS MOU, Apple Bank engaged GRC—"a qualified firm"—to perform *independent* work that Apple Bank was precluded from performing on its own behalf.  The key issue is control, not contact.  "It would be quite unusual if a service provider never had any contact with its client, and the existence of such contact does not support an inference of supervision and control." *Jean–Louis.*, 838 F. Supp. 2d at 128.  Apple Bank did not control the *independent* review and audit functions performed by GRC and its employees.

The non-solicitation provisions in the MSA and GRC proposals reinforce the concept of separateness between Apple Bank and GRC employees to maintain the independent nature of the review—and thwarts the notion of Apple Bank maintaining control over Plaintiffs or other GRC employees. (Yuzek Aff., Exs. C at p. 3, ¶ 4, "Non-Solicitation," D at p. 7 (3rd paragraph), F at p. 8 (1st paragraph), and G at p. 11 (final paragraph).)

6.      *The Nature Of The Work Performed And The Time Constraints Mandated By The FDIC And NYSDFS Impacted The Amount Of Time Devoted To The Project*

The sixth functional control factor concerns whether plaintiffs worked exclusively or predominantly for the purported joint employer.  *Zheng,* 355 F.3d at 72.  Plaintiffs allege they worked "over 65 hours," per week throughout the duration of their "employment" with Apple Bank.  (ECF. No. 1, ¶¶ 99, 103, 118, 125.)  But whether Plaintiffs worked "exclusively or

predominantly" on the Bank Project is not significant here, due to the circumstances of GRC's engagement. This factor is meant to differentiate between a situation in which the "joint employer may *de facto* become responsible… for the amount workers are paid and for their schedules . . . [and situations] where a subcontractor performs merely a majority of its work for a single customer." *Zheng,* 355 F.3d at 75. In the latter situation, "there is no sound basis on which to infer that the customer has assumed the prerogatives of an employer." *Id.* The undisputed fact here is that GRC employees "came and went," and were on-boarded to and off-boarded from the Project, under the supervision and control of GRC. (Yuzek Aff., Exs. I and J.) This critical factor supports the Bank's summary judgment motion. (*See supra* p. I (A)(2).)

*     *     *

The determination of whether a defendant is a joint employer is based on the "*totality of the circumstances*" in light of the economic realities of the employer-employee relationship. *Jean-Louis,* 838 F. Supp. 2d at 122 (emphasis added). These circumstances do not support a finding of joint employment on the part of the Bank, and summary judgment is warranted in its favor.

## II.

### PLAINTIFFS' FLSA CLAIMS ARE ALSO TIME-BARRED
### FOR LACK OF WILLFULNESS AND CERTAIN NYLL CLAIMS ALSO FAIL

Plaintiffs' FLSA claims are time-barred. The FLSA permits a plaintiff to recover wages within two years after the claim accrues, unless the plaintiff can demonstrate that the employer violated the act willfully, in which case the limitations period is extended to three years. 29 U.S.C. § 255(a). Curry was terminated by PGX, GRC's affiliate, from the Project by August 26, 2019, Mazzitelli was terminated by GRC from the Project in February 2018, and Pilgrim resigned from the Project by June 11, 2018. (ECF No. 1, ¶¶ 108, 116, and 127.) The Complaint, however, was filed on August 27, 2020—more than two years after Plaintiffs' claims began to accrue.

21

The burden is on the plaintiff to show willfulness on the part of the employer. *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014). A violation of the FLSA is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the statute. *McLaughlin v. Richland Shoe, Co.,* 486 U.S. 128, 133 (1988). *See also Clarke v. JPMorgan Chase Bank, N.A.,* No. 08 CIV. 2400 (CM) (DCF), 2010 WL 1379778, at *10 (S.D.N.Y. Mar. 26, 2010) (FLSA plaintiffs seeking to invoke a three-year statute of limitations period cannot survive a motion for summary judgment unless they make a "competent demonstration" that there is a "trialworthy" issue as to whether their employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute).

Mere negligence is insufficient, and an employer does not willfully violate the FLSA even if it acted "unreasonably, but not recklessly, in determining its legal obligation." *McLaughlin,* 486 U.S. at 135 n. 13. With respect to a FLSA claim, recklessness is defined as "at the least, an extreme departure from the standards of ordinary [,] care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *McLean v. Garage Mgmt. Corp*., No. 09 CIV. 9325 (DLC), 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012) (citation omitted).

While the determination of willful conduct has been called "a fact-intensive inquiry," *Goodman v. Port Auth. of New York & New Jersey*, 850 F. Supp. 2d 363, 381 (S.D.N.Y. 2012), a determination of a lack of willfulness may still be made in the absence of discovery, particularly when a plaintiff's allegations are unsubstantiated or conclusory. *See, e.g. Watkins v. First Student, Inc.,* No. 17-CV-1519 (CS), 2018 WL 1135480, at *7-8 (S.D.N.Y. Feb. 28, 2018) (determining, prior to the action's discovery phase, that the two-year statute of limitations applied  because

Plaintiff "failed to plead sufficient facts to render plausible the conclusion that Defendant acted willfully").

Plaintiffs' allegations that Apple Bank willfully violated the FLSA are unsupportable. Plaintiffs allege in the Complaint that Apple Bank "utilized the services of P&G, GRC, and PGX to aid and abet it in a fraud to avoid paying overtime wages and to avoid the payment of employment taxes" on behalf of Plaintiffs "and others similarly situated" by "knowingly and purposefully misclassifying" them as "independent contractors rather than employees." (ECF No. 1, ¶ 48.) This allegation is contradicted by documentary evidence. The Consent Order and MOU establish that the FDIC and NYSDFS each *required* Apple Bank "to engage a qualified firm," acceptable to the Regional Director of the FDIC and to the Superintendent of the NYSDFS, to independently test, monitor and validate Apple Bank's AML and BSA Compliance Program, including its suspicious activity monitoring system, in conformance with Federal and State directives mandating such independent testing. (Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.) Therefore, Apple Bank engaged GRC to comply with the Bank's express legal obligations to have such work undertaken by an independent third party. (*Id.*) In light of this documentary evidence, Plaintiffs' conclusory allegations cannot withstand Apple Bank's motion for summary judgment. *Gustafson v. Bell Atl. Corp.,* 171 F. Supp. 2d 311, 323-24 (S.D.N.Y. 2001) (granting defendants' request for summary judgment on the FLSA claims that accrued more than two years before filing of the complaint because plaintiff failed to carry its burden of proving a willful or reckless violation of the FLSA, where, as here, plaintiff "only speculates that the Company willfully attempted to conceal plaintiff's eligibility for overtime pay by hiring him as an independent contractor").

Here, the documentary evidence is decisive that Apple Bank had a sound basis reasonably to believe it was *not* Plaintiffs' employer, and thus could not have known or have recklessly

disregarded its alleged obligations under the FLSA or NYLL.  Such a belief is in accord with Apple Bank's obligations under the FDIC Consent Order and NYSDFS MOU to engage a "qualified firm," such as GRC.  (Yuzek Aff., Exs. A at pp. 7-8 and B at pp. 6-7.)  There is no willfulness when a defendant's reasonable interpretation of the law indicates that it was not an employer.  *See, e.g. Toles v. Schillaci,* No. 04-CV-6126, 2006 WL 4536000, at *4 (W.D.N.Y. Sept. 29, 2006), *report and recommendation adopted*, No. 04-CV-6126, 2007 WL 709330 (W.D.N.Y. Mar. 5, 2007) ("[U]nder the facts presented here, it was reasonable for the County not to consider Toles as an employee under the FLSA…The factual, legal and regulatory evidence in the record before this Court does not provide proof of willfulness").

The contractual agreements between Apple Bank and GRC similarly support the Bank's reasonable belief that it was *not* Plaintiffs' employer or a joint employer with GRC.  In the non-solicitation provision of the MSA, and other executed proposals, Apple Bank expressly agreed not to "*knowingly solicit for employment* or other engagement" "any GRC Agent" to "avoid the potential for (or the appearance of) any actual or potential conflict of interest (including, without limitation, lack of GRC Agent independence)" (emphasis added).  (Yuzek Aff., Ex. C at p. 3, ¶ 4 "Non-Solicitation;" *see also* Exs. D at p. 7 (3rd paragraph), F at p. 8 (1st paragraph), and G at p. 11 (final paragraph).)

Indeed, the non-solicitation language of the MSA affirmed that "[a]n intentional breach of this provision shall be deemed a material breach of this MSA by the Bank, and the Bank shall pay GRC Solutions liquidated damages." (*Id*.)  Apple Bank, accordingly, had every reason to believe that it was not a joint employer of Plaintiffs, and that any FLSA entitlements to which Plaintiffs may have been entitled were being provided for by their employer, GRC. Plaintiffs cannot establish that Apple Bank had any awareness of alleged violations under the FLSA or was

24

"subjectively aware of a substantial danger that [its] compensation system violated the FLSA, but chose to stick with it nonetheless." *McLean,* 2012 WL 1358739 at *7. The contractual agreements with GRC, the Consent Order, and the MOU all support that Apple Bank reasonably believed it was not a joint employer and, thus, not subject to the FLSA.[4]

"[A]s plaintiffs have not supported their conclusory allegations with facts sufficient to render the allegations of [Apple Bank's] willful misconduct plausible, they are not entitled to engage in discovery in order to determine whether they can allege a plausible claim." *Holmes v. Air Line Pilots Ass'n, Int'l,* 745 F. Supp. 2d 176, 203 (E.D.N.Y. 2010). As Plaintiffs cannot meet their burden, the FLSA claims against Apple Bank are time-barred, and summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, Apple Banks motion for summary judgment should be granted.

Dated: New York, New York
December 3, 2020

INGRAM YUZEK GAINEN CARROLL
& BERTOLOTTI, LLP

By: _____

Dean G. Yuzek (dyuzek@ingramllp.com)
Jennifer B. Zourigui (jzourigui@ingramllp.com)
Amanda B. Grannis (agrannis@ingramllp.com)
150 East 42nd Street, 19th Floor
New York, New York, 10017
(212) 907-9600

*Attorneys for Defendant Apple Bank for Savings*
*sued herein as Apple Bancorp, Inc.*
*d/b/a Apple Bank for Savings*

---

[4] Apple Bank's good-faith belief that Plaintiffs were not its employees, and that it was not obligated to supply them with "time of hire" notices or wage statements under the NYLL, is also an affirmative defense to Plaintiffs' claims under NYLL § 195 (1) and (3) in Counts III and IV of the Complaint. *See* N.Y. Lab. Law § 198 (1)(b) and (1)(d). Thus, Counts III and IV of the Complaint fail on this ground as well.

660776_7/00452-0209