# Exhibit B

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("Memorandum"), entered into between the Board of Directors ("Board") of Apple Bank for Savings, Manhasset, New York (the "Bank") and the New York State Department of Financial Services ("NYSDFS") is intended to address and resolve the deficiencies and supervisory concerns identified during a targeted examination of the Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") Compliance Program conducted by examiners from the Federal Deposit Insurance Corporation ("FDIC") as of April 6, 2015 (the "Target Examination").

The Bank Secrecy Act is codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951–1959, and 31 U.S.C. §§ 5311–5332, and implemented by rules and regulations issued by the United States Department of Treasury (31 C.F.R. Part 103) and by § 326.8 and Part 353 of the FDIC Rules and Regulations (12 C.F.R. § 326.8 and 12 C.F.R. Part 353) (all, hereinafter, collectively, the "BSA"). The rules and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") are set forth at 31 C.F.R. Part 500 et seq. The relevant regulations of the NYSDFS are set forth in 3 N.Y.C.R.R. Parts 116 and 300.

Pursuant to this Memorandum, the Board commits to take the following corrective actions to alleviate regulatory concerns relating to the conduct of the Bank's business:

## BSA/AML OVERSIGHT

1.      (a)      The Board shall provide for ongoing and appropriate supervision and direction of the Bank's BSA/AML Compliance Program, assuming full responsibility for the approval of sound policies, procedures, and processes, including holding regularly scheduled Board meetings, at which it shall review the Bank's compliance with this Memorandum. The Bank's Board minutes shall document these reviews.

(b)     Within 120 days from the effective date of this Memorandum, the Bank shall develop a written plan to provide for ongoing Board oversight of the Bank's compliance with applicable BSA/AML statutory and regulatory requirements ("Board Oversight Plan"). At a minimum, the Board Oversight Plan shall provide for a sustainable governance framework that includes the following:

(i)     Ongoing effective control and oversight of the Bank's compliance with BSA/AML and OFAC requirements; and

(ii)    Clearly defined roles and accountabilities for Bank management and personnel regarding BSA/AML and OFAC compliance, and appropriate qualifications on the part of those entrusted with such responsibilities;

(c)     Within 30 days of completion, the Board Oversight Plan shall be submitted to the Superintendent of Financial Services of the State of New York (the "Superintendent") for non-objection or comment. Within 30 days from receipt of non-objection or comments from the Superintendent, and after incorporation and adoption of any, and all comments, the Board shall approve the Board Oversight Plan and record such approval in the minutes of the Board meeting. Thereafter, the Board shall implement and fully comply with the Board Oversight Plan.

(d)     The Bank shall have and retain management and staff with the qualifications, authority, and experience commensurate with their responsibilities to ensure compliance with all applicable BSA/AML laws and regulations and all aspects of the Bank's BSA/AML Compliance Program.

(e)     Within 90 days from the effective date of this Memorandum, and periodically thereafter, and no less than annually, the Bank shall perform a review of its BSA training, as well as staffing needs to ensure adequate and appropriate resources are in place at all times. The review

shall include, at a minimum, consideration of the institution's size and growth plans, geographical areas served, products and services offered, and changes to the BSA/AML laws and regulations.

## BSA/AML RISK ASSESSMENT

2.      Within 120 days from the effective date of this Memorandum, the Bank shall review and enhance its risk assessment of the Bank's operations ("Risk Assessment"), in accordance with the findings of the Target Examination, and consistent with the guidance for risk assessments set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual ("BSA Manual"), and shall establish appropriate written policies, procedures, and processes regarding Risk Assessments. The Bank shall conduct periodic Risk Assessments of the Bank's operations for BSA/AML purposes no less than annually.

## BSA INTERNAL CONTROLS

3.      (a)      Within 120 days from the effective date of this Memorandum, the Bank shall develop a system of internal controls, policies, procedures, and processes designed to ensure full compliance with the BSA ("BSA Internal Controls") taking into consideration the Bank's size and risk profile, as determined by the Risk Assessment required by paragraph 2 of this Memorandum.

(b)      At a minimum, such system of BSA Internal Controls shall include policies, procedures, and processes addressing the following areas:

(i)      Suspicious Activity Monitoring and Reporting: The Bank shall, taking into account its size and risk profile, develop, adopt and implement policies, procedures, processes, and systems for monitoring, detecting, and reporting suspicious activity being conducted in all areas within or through the Bank; and provide for the timely, accurate, and complete filing of Suspicious Activity Reports ("SARs") as required by law, with an appropriate level of documentation and support for management's decisions to file or not to file a SAR. Such policies, procedures, and systems shall ensure that the investigation and resolution of alerts generated by

3

the suspicious activity monitoring system are appropriately tracked, addressed in a timely manner, fully documented, and adequately supported. Such policies, procedures, processes, and systems shall also require that all relevant areas of the Bank are monitored for suspicious activity, including, but not limited to the recommendations set forth in the Target Examination. Any systems the Bank plans to utilize to assist in monitoring, detecting, and reporting suspicious activity shall be validated, and parameters, which are established, shall be supported through a documented analysis of appropriate information.

(ii)     Customer Due Diligence: The Bank shall review and enhance its customer due diligence ("CDD") policies, procedures, and processes for new and existing customers to:

a.     Be consistent with the guidance for CDD set forth in the BSA Manual;

b.     Operate in conjunction with its Customer Identification Program ("CIP"); and

c.     Enable the Bank to reasonably anticipate the types of transactions in which a customer is likely to engage.

(iii)     At a minimum, the CDD program shall provide for:

a.     A risk assessment of the customer base through an appropriate risk rating system to ensure that the risk level of the Bank's customers is accurately identified based on the potential for money laundering or other illicit activity posed by the customer's activities, with consideration given to the purpose of the account, the anticipated type and volume of account activity, types of products and services offered, and locations and markets served by the customer;

b.     An appropriate level of ongoing monitoring commensurate with the risk level to ensure that the Bank can detect suspicious activity and accurately determine which customers require enhanced due diligence ("EDD");

4

c.     Processes to obtain and analyze a sufficient level of customer information at account opening to assist and support the risk ratings assigned;

d.     Processes to document and support the CDD analysis, including a method to validate risk ratings assigned at account opening, and resolve issues when insufficient or inaccurate information is obtained; and

e.     Processes to ensure the timely identification and accurate reporting of known or suspected criminal activity, as required by the suspicious activity reporting provisions of Part 353 of the FDIC's Rules and Regulations ((12 C.F.R. Part 353) and any other applicable laws and regulations.

(iv)    <u>Enhanced Customer Due Diligence</u>: The Bank shall review and enhance its EDD policies, procedures and processes to conduct EDD necessary for those categories of customers the Bank has reason to believe pose a heightened risk of suspicious activity, including, but not limited to, the high-risk accounts identified in the Target Examination. The EDD policies, procedures, and processes shall:

a.     Be consistent with the guidance for EDD set forth in the BSA Manual; and

b.     Operate in conjunction with its CIP and CDD policies, procedures, and processes.

(v)    At a minimum, the EDD program shall include procedures to:

a.     Determine the appropriate frequency for conducting ongoing reviews based on customer risk level;

b.     Determine the appropriate documentation necessary to conduct and support ongoing reviews and analyses in order to understand the normal and expected transactions of the customer; and

5

           c.      Ensure the timely identification and accurate reporting of known or suspected criminal activity, as required by the suspicious activity reporting provisions of Part 353 of the FDIC's Rules and Regulations (12 C.F.R. Part 353) and all applicable laws and regulations.

           (vi)    Within 120 days from the effective date of this Memorandum, the Bank shall memorialize in a remediation plan ("Remediation Plan") the steps it has taken to address the CDD and EDD deficiencies identified in the Target Examination within the Bank's customer accounts. The Remediation Plan shall include methods to ensure that all necessary CDD and EDD are performed and documented in accordance with the relevant provisions of this paragraph.

           (vii)   The BSA internal control policies, procedures, processes, and practices shall operate in conjunction with each other and be consistent with the guidance for account/transaction monitoring and reporting set forth in the BSA Manual, including arranging for the dissemination of a high-risk customer list to appropriate departments within the Bank.

           (c)     The Board shall approve the revised BSA internal control policies and procedures and the Remediation Plan, and record such approvals in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the revised internal control policies and procedures and the Remediation Plan.

## VALIDATION OF SUSPICIOUS ACTIVITY MONITORING SYSTEM

4.     Within 120 days from the effective date of this Memorandum, the Bank shall engage a qualified firm acceptable to the Superintendent to perform a validation of the Bank's suspicious activity monitoring system, which shall include testing of the effectiveness of established filtering criteria and thresholds and ensuring that the system appropriately detects potentially suspicious activity. Thereafter, testing of the system's effectiveness shall be performed as part of the Bank

audit reviews, with results available for review by the NYSDFS at subsequent visitations and examinations.

## REPORTS

5.      The Bank shall review and enhance its policies, procedures, and processes in order to detect reportable transactions and ensure that all required reports, including Currency Transaction Reports ("CTRs"), SARs, Reports of International Transportation of Currency or Monetary Instruments, Reports of Foreign Bank and Financial Accounts, and any other similar or related reports required by applicable BSA/AML laws or regulations are completed accurately and properly filed within required timeframes.

## LOOK BACK REVIEW

6.      (a)      Within 60 days from the effective date of this Memorandum, the Bank shall engage a qualified firm acceptable to the Superintendent to conduct a review of all accounts and transaction activity for the time period beginning October 1, 2014 through December 16, 2015, in accordance with a written protocol to be submitted to the Superintendent for non-objection to determine whether suspicious activity involving any accounts or transactions within or through the Bank was properly identified and reported in accordance with the applicable suspicious activity reporting requirements (the "Look Back Review").

(b)      Within 120 days of receipt of the Superintendent's non-objection, the qualified firm shall commence the Look Back Review, and the Bank shall prepare any additional CTRs and SARs necessary based upon the review.  Upon completion of the Look Back Review, the Bank shall submit the findings of the review to the Superintendent.

## PROGRESS REPORTS

7.      Within 45 days from the end of each calendar quarter following the effective date of this Memorandum, the Bank shall furnish to the Superintendent written progress reports detailing the

7

form, manner, and results of any actions taken to secure compliance with this Memorandum. All

progress reports and other written responses to this Memorandum shall be reviewed by the Board,

recorded in the minutes of the Board meeting, and retained in the Bank's records.

## NOTICES

All Notices and Communications regarding this Memorandum shall be sent to:

For the NYSDFS:
>Yolanda Ford
>Assistant Deputy Superintendent of Banks
>New York State Department of Financial Services
>One State Street
>New York, New York 10004

For the Bank:
>Alan Shamoon
>President and Chief Executive Officer
>Apple Bank for Savings
>122 East 42nd Street
>New York, New York 10168

## MISCELLANEOUS

The provisions of this Memorandum shall not bar, estop, or otherwise prevent the NYSDFS

or any other federal or state agency or department from taking any other action against the Bank

or any of the Bank's current or former institution-affiliated parties.

This Memorandum contains confidential supervisory information and should be treated

accordingly. The contents of this Memorandum are subject to the confidentiality restrictions of

New York Banking Law § 36(10) with respect to the disclosure of confidential supervisory

information.

The provisions of this Memorandum shall remain effective and enforceable except to the

extent that and until such time as any provision this Memorandum has been modified,

terminated, suspended, or set aside by the NYSDFS.

8

Each provision of this Memorandum shall be binding upon the Bank, its directors, officers, employees and agents, its institution-affiliated parties, and any successors and assigns thereof.

The effective date of this Memorandum will be the date it is executed by the Deputy Superintendent of the Banking Division.


Alan Shamoon
President and Chief Executive Officer
Apple Bank for Savings

Jean Walsh
Deputy Superintendent of the Banking Division
New York State Department of Financial Services


Date: _1/29/16_