UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

KENNETH CURRY, RICARDO MAZZITELLI
and JACQUELINE BROWN-PILGRIM,

                Plaintiffs,

        - against -

P&G AUDITORS AND CONSULTANTS,
LLC, GRC SOLUTIONS, LLC, PGX, LLC and
APPLE BANCORP, INC,

                Defendants

        - and -

GRC SOLUTIONS, LLC and PGX, LLC,

                Crossclaim Plaintiffs,

        - against -

KDC CONSULTING, LLC, KENNETH
CURRY (IN HIS CAPACITY AS MANAGING
MEMBER OF KDC CONSULTING, LLC),
MAZZITELLI CONSULTING, LLC,
MAZZITELLI CONSULTING
INCORPORATED, BROPIL CONSULTING,
LLC, JACQUELINE BROWN-PILGRIM (IN
HER CAPACITY AS MANAGING MEMBER
OF BROPIL CONSULTING, LLC), and
DENNIS PILGRIM (IN HIS CAPACITY AS
MANAGING MEMBER OF BROPIL
CONSULTING, LLC),

                Crossclaim
                Defendants.

------------------------------------------------------- x

Case No. 20-cv-06985 (LTS)(SLC)

**MEMORANDUM OF LAW IN
OPPOSITION TO MOTION FOR
COLLECTIVE ACTION NOTICE**

DAVIS WRIGHT TREMAINE LLP
Michael J. Goettig
Lyle S. Zuckerman
1251 Avenue of the Americas,
21st Floor
New York, New York 10020
(212) 489-8230
*Counsel for Defendants
P&G Auditors and Consultants, LLC,
GRC Solutions, LLC and PGX, LLC
and Crossclaim Plaintiffs GRC
Solutions, LLC and PGX, LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND AND PROCEDURAL POSTURE .................................................................. 3

I.      PROJECT 1, LOOKBACK 2 (JULY 2017-FEBRUARY 2018) ....................................... 3

        A.      Ricardo Mazzitelli .......................................................................................... 3

        B.      KDC Consulting LLC ...................................................................................... 6

II.     PROJECT 2, LOOKBACK 2 (APRIL 2018-AUGUST 2018) .......................................... 9

        A.      KDC Consulting LLC ...................................................................................... 10

        B.      Bropil Consulting LLC .................................................................................... 11

III.    SETTLEMENT OF THE *BEDIAKO* ACTION .............................................................. 13

IV.     RELEVANT PROCEDURAL POSTURE ...................................................................... 14

ARGUMENT ......................................................................................................................... 15

I.      PLAINTIFFS' RELIANCE ON THE BEDIAKO ACTION IS MISPLACED ............... 15

II.     THE COURT SHOULD DENY PLAINTIFFS' MOTION TO SEND NOTICE ........... 16

        A.      Legal Standard ............................................................................................... 16

        B.      Plaintiffs' Submissions Do Not Demonstrate Existence of an
                Unlawful Policy ............................................................................................. 17

                1.      Allegations of a Common Classification are Not Sufficient .................... 17

                2.      Plaintiffs' Declarations Do Not Address the Economic Realities
                        of the Parties' Relationship .................................................................. 18

        C.      The Notice and Related Documents are Fatally Defective ................................ 20

III.    THE COURT SHOULD NOT EQUITABLY TOLL THE LIMITATIONS PERIOD .... 23

CONCLUSION ...................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Brock v. Superior Care, Inc.*,
    840 F.2d 1054 (2d Cir. 1988) ................................................................................................18

*Brown v. Barnes and Noble, Inc.*,
    252 F. Supp. 3d 255 (S.D.N.Y. 2017) ....................................................................................17

*Brown v. Mustang Sally's Spirits and Grill, Inc.*,
    No. 12 cv 00529S, 2012 WL 4764585 (W.D.N.Y. Oct. 5, 2012) ...........................................21

*Browning v. Ceva Freight, LLC*,
    885 F.Supp.2d 590 (E.D.N.Y. 2012) ......................................................................................18

*Cheeks v. Freeport Pancake House, Inc.*,
    796 F.3d 199 (2d Cir. 2015) ...................................................................................................14

*Copantitla v. Fiskardo Estiatorio, Inc.*,
    788 F. Supp. 2d 253 (S.D.N.Y. 2011) ....................................................................................24

*Garcia v. Chipotle Mexican Grill, Inc.*,
    No. 16 cv 601, 2016 WL 6561302 (S.D.N.Y. No. 4, 2016) ...................................................16

*Gjurovich v. Emmanuel's Marketplace, Inc.*,
    282 F. Supp. 2d 101 (S.D.N.Y. 2003) ....................................................................................16

*Gordon v. Kaleida Health*,
    No. 08 cv 78S, 2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009) ..............................................21

*Gustafson v. Bell Atlantic Corp.*,
    171 F.Supp.2d 311 (S.D.N.Y. 2001) ......................................................................................19

*Hart v. RCI Hospitality Holdings, Inc.*,
    90 F. Supp. 3d 250 (S.D.N.Y. 2015) ......................................................................................15

*Hoffman v. Sbarro, Inc.*,
    982 F. Supp. 249 (S.D.N.Y. 1997) .........................................................................................17

*Hoffman-LaRoche Inc. v. Sperling*,
    493 U.S. 165 (1989) ...............................................................................................................16

*Lopes v. Heso, Inc.*,
    No. 16 cv 6796, 2017 WL 4863084 (E.D.N.Y. Oct. 27, 2017) ..............................................23

*McGlone v. Contract Callers, Inc.*,
   867 F. Supp. 2d 438 (S.D.N.Y. 2012).....................................................................................16

*McGuiggan v. CPC Intern., Inc.*,
   84 F. Supp. 2d 470 (S.D.N.Y. 2000).......................................................................................18

*Melgadejo v. S&D Fruits & Vegetables, Inc.*
   No. 12 cv 6852, 2013 WL 5951189 (S.D.N.Y. Nov. 7, 2013) ...............................................21

*Playboy Enters., Inc. v. Chuckleberry Pub., Inc.*,
   486 F.Supp. 414 (S.D.N.Y.1980) ...........................................................................................15

*Qi Zhang v. Bally Produce, Inc.*,
   No. 12 Civ. 1045, 2013 WL 1729274 (S.D.N.Y. Apr. 22, 2013)...........................................22

*Racey v. Jay-Jay Cabaret, Inc.*,
   No. 15 cv 8228, 2016 WL 3020933 (S.D.N.Y. May 23, 2016)..............................................23

*Reyes v. Nidaja, LLC*,
   No. 14 cv 9812, 2015 WL 4622587 (S.D.N.Y. Aug. 3, 2015) ..............................................22

*Rotari v. Mitoushi Sushi, Inc.*,
   448 F.Supp. 3d 246 (E.D.N.Y. 2020) ...............................................................................24, 25

*Saleem v. Corporate Trans. Group, Ltd.*,
   52 F.Supp.3d 526 (S.D.N.Y. 2014) .........................................................................................19

*Trinidad v. Pret A Manger (USA) Ltd.*,
   962 F. Supp. 2d 545 (S.D.N.Y. 2013)......................................................................................16

*Velasquez v. Digital Page, Inc.*,
   No. 11 cv3892, 2014 WL 2048425 (E.D.N.Y. May 19, 2014)...............................................23

*Wallace v. Kato*,
   549 U.S. 384 (2007)..................................................................................................................24

*Whitehorn v. Wofang's Steakhouse, Inc.*,
   767 F. Supp. 2d 445 (S.D.N.Y. 2011)......................................................................................21

*Young v. Cooper Cameron Corp.*,
   229 F.R.D. 50 (S.D.N.Y. 2005) ...............................................................................................17

*Zerilli-Edelglass v. New York City Transit Auth*,
   333 F.3d 74 (2d Cir. 2003)..................................................................................................23, 24

**Federal Statutes**

29 U.S.C. § 216(b) ....................................................................................2, 17

29 U.S.C. § 256....................................................................................21

Defendants P&G Auditors and Consultants, LLC ("P&G"), GRC Solutions, LLC ("GRC") and PGX, LLC ("PGX," and referred to collectively with P&G and GRC as "Contractor Defendants," all of whom are referred to together with co-defendant Apple Bancorp, Inc. ("Apple Bank") as "Defendants"), by and through their undersigned counsel, respectfully submit that the Court should deny in its entirety the motion by plaintiffs Kenneth Curry ("Curry"), Ricardo Mazzitelli ("Mazzitelli") and Jacqueline Brown-Pilgrim ("Pilgrim," referred to collectively with Curry and Mazzitelli as "Plaintiffs") for court-authorized notice of pendency of this putative collective action and related relief.

## PRELIMINARY STATEMENT

In relevant part, this is a putative collective action that was commenced by three principals of business entities, claiming entitlement to unpaid overtime premiums under the Fair Labor Standards Act (the "FLSA") in connection with services rendered on two separate projects for Apple Bank. Each of the Plaintiffs has a years-long established history of providing these professional services on an independent contractor basis to clients throughout the financial services industry. Each *admits* in this action that they established and maintained business entities in connection with the services they provided to their respective contracting counterparties. What's more, in connection with their pitches to GRC or PGX, each of the Plaintiffs demonstrated how they were independently engaged in their own business enterprises and expressly acknowledged that they were not entitled to any employment-related benefits from either GRC or PGX. They acted in accordance with those agreements until, again by their own admission, they saw the amount that was paid to settle claims asserted by thirteen plaintiffs in a prior lawsuit commenced against the Contractor Defendants. The business-related considerations which prompted settlement of that prior action – and which are entirely unrelated to the merits of those plaintiffs'

claims – are not present here.  Beyond establishing the Plaintiffs' motivation in commencing this action, that prior settlement has no relevance whatsoever to the instant action.

The Court should deny Plaintiffs' motion.  While the standard for Court-authorized notice under Section 216(b) is lenient, it is neither automatic nor appropriate in every case.  Here, Court-authorized notice is not appropriate because Plaintiffs have not met the low burden of showing that they or any other putative plaintiff were victims of an *unlawful* policy or practice under the FLSA – and in fact, the evidence in the record to date indicates directly the opposite.  Plaintiffs' own sworn representations to this Court, together with the representations that they made to GRC and/or PGX at the time of their engagement, fail to suggest that they or anyone to whom they propose to send notice of pendency are entitled to the protections of the FLSA.

The Court should also deny Plaintiffs' motion because of the materially misleading and incomplete nature of the draft notice of pendency that Plaintiff's counsel has proposed.  It makes no distinction between the two projects at issue in this lawsuit, and purports to provide notice to contractors with which Plaintiffs are not similarly situated, in contravention of Plaintiffs' own pleadings.  Additionally, in order to provide potential plaintiffs with adequate information concerning this action, any notice that issues should advise them of the tax consequences that they may face by now taking positions inconsistent with representations that they may have previously made to state and federal tax authorities, as well as of the fact that certain of the Contractor Defendants have asserted cross-claims against their contracting counterparties.

Finally, the Court should deny that part of Plaintiff's motion seeking a tolling of the applicable limitations period.  Not only do the circumstances presented here fail to warrant that extraordinary relief, but Plaintiffs' own contumacious conduct – by first representing to the Court that they would forego the instant motion if Defendants agreed to toll the limitations period, only

to subsequently withhold consent to the parties' tolling agreement unless GRC and PGX agreed to waive substantive contractual and legal rights – compels denial of that part of their motion.

**BACKGROUND AND PROCEDURAL POSTURE**

**I.     PROJECT 1, LOOKBACK 2 (JULY 2017-FEBRUARY 2018)**

On or around April 14, 2016, GRC entered into an agreement with Apple Bank to provide services in connection with a "BSA/AML Transaction Look Back Review" ("Project 1"). Declaration of Michael J. Goettig ("Goettig Decl."), Exh. A.  That project was separated into two phases, the second of which involved the on-site analysis of the financial activities of certain Apple Bank account holders to identify suspicious financial activity ("Project 1, Lookback 2").  *Id.*  In connection with Project 1, Lookback 2, GRC engaged professional consultants with the knowledge, experience and credentials that qualified them to conduct such reviews.  Due to the highly regulated nature of the financial services industry, GRC conducted due diligence on all of the contractors engaged to provide services in connection with Project 1, Lookback 2, including by conducting background checks on its contracting counterparties and the personnel that would have access to the sensitive financial information of Apple Bank's account holders.  Declaration of Melissa Taylor ("Taylor Decl."), ¶ 3.  Mazzitelli and Curry were two of the professionals who provided services in connection with Project 1, Lookback 2.

**A.     Ricardo Mazzitelli**

In June 2017, Mazzitelli sought to be engaged by GRC to provide services on an independent contractor basis in connection with Project 1, Lookback 2.[1]  In the *curriculum vitae* he submitted in connection with those efforts, he described himself as an "[a]ttorney with strong

---

[1] In his declaration in support of this motion, Mazzitelli claims to have been engaged on "Lookback Review Phase 1."  This is inaccurate.  Mazzitelli's services were limited to the second phase of first project.  *Compare* December 9, 2020 Declaration of Ricardo Mazzitelli, Dkt. No. 50 ("Mazzitelli Decl."), ¶ 2 *and* Taylor Decl., Exhibits D and E.

analytical, research and writing skills."  Taylor Decl., Exh. A.  He described himself as having "[c]ompliance experience in correspondent, retail and international banking," with a specialty in "anti-money laundering (AML), KYC, fraud investigation and [a]udit[s]."   He claimed "[k]nowledge of the US Patriot Act, Bank Secrecy Act, KYC requirements and Suspicious Activity Reporting (SARs)," as well as of "Office of Foreign Assets Control regulations (OFAC) and 'Know Your Customer' Compliance Banking Training (KYC)."   *Id.*   He also summarized a decade-long history of providing services as an "AML/KYC Compliance Consultant" to no fewer than twelve financial institutions and professional service providers, including but not limited to JPMorgan Chase, American Express and Barclays Capital.  *Id.*  These engagements ranged in duration from four months to over a year and a half.  *Id.*

A background check run on Mazzitelli confirmed that he had provided consulting services as an independent contractor to Treliant Risk Advisors LLC and Ernst and Young, two of the clients that he had identified on is *curriculum vitae*.  Taylor Decl., Exh. B.  It also verified that Mazzitelli had been "self employed" since 2008, recently through a business entity known as Mazzitelli Consulting LLC.  *Id.*  Mazzitelli Consulting LLC is an active New York Limited Liability Corporation with an initial filing date of June 13, 2011, which, according to the Complaint, was the entity through which he provided services in connection with Project 1, Lookback 2.  Goettig Decl., Exh. B; Complaint, ¶ 112 ("On or about June 13, 2017, GRC and Mazzitelli, through an entity he created, Mazzitelli Consulting, LLC, entered into a Master Service Agreement and Statement of Work").

On the strength of Mazzitelli's background and expertise, GRC entered into a Master Independent Contractor Agreement (the "Mazzitelli Agreement") with him on or around June 9, 2017.  Taylor Decl., Exh. C.  In that agreement, Mazzitelli agreed to "perform consulting services

on an 'as needed' basis as an independent contractor."  The Mazzitelli Agreement also specified, "For every hour you provide services hereunder, you shall be paid at a professional hourly rate as agreed upon per assignment pursuant to the addendum."  *Id.*, at 1.  In the Mazzitelli Agreement, Mazzitelli covenanted that he would "accept responsibility in meeting the Client's project schedule with agreed upon budgeted hours."  *Id.*, at 2.  The Mazzitelli Agreement called upon him to "devote as much of [his] contracted time, energy and abilities to the performance of duties hereunder as is necessary to perform the required duties in a timely and productive manner," and expressly acknowledged that Mazzitelli was free to "provide services to others and through any other person or entity during those times [he was] not performing work under this Master Agreement," subject to certain confidentiality obligations.  *Id.,* at 3.  Additionally, Mazzitelli was free to decline any given project and, with regard to time away from a project, was required only to "provide as much notice as possible of any periods during which [he was] not available for work so that it can be rescheduled."  *Id.*, at 2.

Also on June 9, 2017, the parties entered into an addendum to the Mazzitelli Agreement, calling for the provision of services in connection with Project 1, Lookback 2.  It expressly stated that Mazzitelli would be compensated at an hourly rate for an "estimated 60 hours per week." Taylor Decl., Exh. D.  Mazzitelli completed an IRS Tax Form W-9[2] identifying Mazzitelli Consulting Incorporated, a business entity formed by Melissa Mazzitelli earlier that year, as the entity to which those payments should be remitted.  Taylor Decl., Exh. E; Goettig Decl., Exh. C. Later, on or around September 15, 2017, the parties entered into a second addendum reflecting a change in Mazzitelli's role from QA Lead to Team Lead.  Taylor Decl., Exh. F.

---

[2] In his declaration, Mazzitelli claims that GRC made payments to Mazzitelli Consulting, LLC.  This is inaccurate. *Compare* Mazzitelli Decl., ¶ 5 *and* Taylor Decl., Exhibit E.

According to Mazzitelli's LinkedIn profile, his responsibilities as Team Lead in connection with Project 1, Lookback 2 were as follows:

> Managed a team of 20 investigators and quality assurance ("QA") analysts, ensuring quality and efficiency (productivity & performance).  Liaise with team and kept them informed of all relevant changes and updates in process of investigation.  Ensure uniform approach to managing team and monitor ongoing productivity.  Maintained daily metrics and tracked aging cases; reprioritized cases as needed.  Conducted data diagnostics of product types and wrote new workflows to help maximize team efficiency and work product, while tracking trends and patterns of team's performance.  Gathered and tracked projections of case completion based on tier complexity and made recommendation to project management.

Goettig Decl., Exh. D.  Mazzitelli's LinkedIn profile draws a distinction between work he performed on a "Full-time" basis and that which he did as an independent contractor.  As recently as January 23, 2021, Mazzitelli described the Apple Bank project as work performed pursuant to a "Contract."  *Id.*

Project 1, Lookback 2 concluded in or around February 2018, at which time Mazzitelli's relationship with GRC concluded.  Taylor Decl., ¶¶ 8-9; Declaration of Ricardo Mazzitelli in Opposition to Apple Bank's Motion for Summary Judgment ("Mazzitelli Opposition Decl."), Dkt. No. 78, ¶¶ 70-72.[3]  According to his LinkedIn profile, after his contract with GRC concluded, Mazzitelli provided consulting services to Mega International Commercial Bank from July 2018 to August 2019.  Goettig Decl., Exh. D.

**B.**     **KDC Consulting LLC**

In October 2017, Curry sought to be engaged by GRC through his business entity KDC Consulting, LLC ("KDC") to provide services on an independent contractor basis in connection

---

[3] For ease of reference, the Mazzitelli Opposition Declaration is attached as Exhibit E to the Goettig Declaration.

with Project 1, Lookback 2.  KDC was formed in July 2016.[4]  Goettig Decl., Exh. F.  In the *curriculum vitae* Curry submitted in connection with KDC's Project 1, Lookback 2 proposal, he identified KDC as the business entity through which he was offering his services, and described himself as an "Investigative professional with 40+ years of combined municipal law enforcement, corporate security and Bank Secrecy Act/Anti-Money Laundering (BSA/AML) investigation experience."  Taylor Decl., Exh. G.  According to that document, Curry stated that KDC "[p]rovides consulting/investigative expertise and services to financial institutions under regulatory review for compliance and/or policy deficiencies."  He further stated that KDC "[p]rovides investigative and analytical expertise pertaining to Alert Clearance, Transaction Monitoring, Suspicious Activity, Quality Control (QC), Know Your Customer (KYC), Enhanced Due Diligence (EDD) and Office of Foreign Asset Control (OFAC) Sanctions" as well as "QC reviews of Investigation and Suspicious Activity Reports (SARs)."  *Id.*  Curry stated that, in connection with these services, he had expertise in "a broad range of regulatory and intelligence resources such as the USA Patriot Act, the Financial Crimes Enforcement Network (FinCen), OFAC, Federal Financial Institutions Examination Council (FFIEC), the Code of Federal Regulations (CFR), Office of the Comptroller of Currency (OCC), Regulatory Data Corporation (RDC), World Check, CLEAR and the Internet."  *Id.*  He also summarized an eleven-year history of "PSA/AML/OFAC Engagements" with over a dozen financial institutions and professional service providers, including but not limited to the Agricultural Bank of China, Discover Financial Services and HSBC Bank.  *Id.*  These engagements ranged in duration from three months to over

---

[4] Curry updated KDC's status as an active business entity on an annual basis until filing a Certificate of Termination on December 1, 2020, approximately two weeks after GRC and PGX articulated an intent to hold KDC to its contractual commitments.  Goettig Decl., Exh. F; Dkt. No. 33.

a year.  *Id.*  A background check run on Curry confirmed that he had worked as an "AML and BSA consultant" since 2006.  Taylor Decl., Exh. H.

On the strength of Curry's background and expertise, GRC entered into a Master Independent Contractor Agreement with KDC (the "KDC Agreement") on or around October 6, 2017.  Taylor Decl., Exh. I.  In that agreement, KDC agreed that "employees of KDC shall not be entitled to any benefits accorded to GRC's employees," and that "KDC shall have the responsibility for … any [and] all compensation paid to employees of KDC."  *Id.*  The KDC Agreement also specified, "For each hour for which KDC provides services hereunder, KDC shall be paid at a professional hourly rate as agreed upon per assignment pursuant to the addendum." *Id.*  As was the case with the Mazzitelli Agreement, KDC was under no duty to accept any given project, was free to provide services to other businesses, and was required only to provide advance notice of any unavailability during a given project.  *Id.*  Pursuant to the terms of the KDC Agreement, Curry provided documentation showing that KDC held Errors and Omissions Liability and General Commercial Liability insurance, with policy effective dates of December 2016. Taylor Decl., Exh. J.  In those plan documents, KDC is described as being in the business of "Security Consultants."

On October 9, 2017, the parties entered into an addendum to the KDC Agreement, calling for the provision of services as an "AML Investigator" in connection with Project 1, Lookback 2. It expressly stated that KDC would be compensated at an hourly rate of $75 per hour for an "estimated 60 hours per week."  Goettig Decl., Exh. G.  To facilitate those payments, KDC submitted an IRS Tax Form W-9 providing its tax identification number.  Taylor Decl., Exh. K. In January 2018, Curry negotiated an increase in the professional services fee payable to KDC, from $75 per hour to $90 per hour.  Goettig Decl., Exh. H.

According to Curry's LinkedIn profile, his responsibilities as AML Investigator while at Apple Bank were as follows:

> Performed investigative analysis, KYC, due diligence and transaction monitoring pursuant to an FDIC ordered "look-back." Duties included but were not limited to, investigation/analysis and disposition of complex customer transactions, trained and coached new investigators, assigned to the escalation team and prepared cases for potential Suspicious Activity Reports (SARs).

Goettig Decl., Exh. I.  Curry's LinkedIn profile specifies that he performed those services as a "BSA/AML Consultant," and not an employee.  *Id.*

KDC's services in connection with Project 1, Lookback 2 concluded on or around February 18, 2018.  Taylor Decl., ¶ 15.

## II.      PROJECT 2, LOOKBACK 2 (APRIL 2018-AUGUST 2018)

On March 27, 2018, approximately one month after Project 1, Lookback 2 concluded, GRC and Apple Bank entered into a Master Services Agreement to govern their relationship from that point forward.  Goettig Decl., Exh. J.  On or around April 6, 2018, GRC provided Apple Bank with a proposal to provide services in connection with a second lookback review project ("Project 2").  Taylor Decl., Exh. L.  Similar to Project 1, the second phase of the project involved on-site analysis of the financial activities of certain Apple Bank account holders; however, it was overseen by a different Project Manager, and involved the engagement of a separate set of subject-matter experts.  Mazzitelli Opposition Decl. (Goettig Decl., Exh. E),[5] ¶¶ 70-72.  PGX – not GRC – contracted with those subject-matter experts to provide services in connection with the second phase of this project ("Project 2, Lookback 2").  Like GRC, PGX conducted due diligence on the contractors engaged to provide services in connection with Project 2, Lookback 2.  Taylor Decl.,

---

[5] In his declaration, Mazzitelli claims that this was actually Phase 2 of Project 1.  This is inaccurate, and contradicted by the relevant agreements – including Mazzitelli's own agreement with GRC.  *Compare* Mazzitelli Decl., ¶ 2 *and* Taylor Decl., Exhibits D and F.

¶¶ 17-18.  Curry and Pilgrim were two of the professionals who provided services as AML Investigators in connection with Project 2, Lookback 2.[6]

### A.   KDC Consulting LLC

On the strength of Curry's performance in connection with Project 1, Lookback 2, KDC was invited to provide a response to a request for a proposal to provide services in connection with Project 2, Lookback 2.  In response to that request, KDC submitted a proposal stating that the services it provided included "investigative expertise to financial institutions under regulatory review for compliance and/or policy deficiencies pertaining to Alert Clearance, Transaction Monitoring, Suspicious Activity, Quality Control (QC), Know Your Customer (KYC), Customer Due Diligence (CDD), Enhanced Due Diligence (EDD) and Office of Foreign Asset Control (OFAC) Sanctions."  It further represented that it "[p]erforms QC reviews of investigations surrounding suspicious and non-suspicious activity" using "a broad range of regulatory and intelligence resources such as the USA Patriot Act, the Financial Crimes Enforcement Network (FinCen), OFAC, Federal Financial Institutions Examination Council (FFIEC), the Code of Federal Regulations (CFR), Office of the Comptroller of Currency (OCC), Regulatory Data Corporation (RDC), World Check, Lexis Nexis World Compliance, CLEAR and the Internet."  Taylor Decl., Exh. M.  KDC further represented that it "is comprised of one employee," with "40+ years of combined municipal law enforcement, corporate security and Bank Secrecy Act/Anti-Money Laundering (BSA/AML) investigation experience."  *Id.*  KDC also proposed a fee of between $90 and $110 per hour for the services to be provided.  *Id.*  On behalf of KDC as its "Owner/Member," Curry also consented to a Business Background Report to be used "as part of

---

[6] Mazzitelli was not invited to submit a proposal to work on Project 2, Lookback 2.  Mazzitelli Opposition Decl., ¶ 72.

the due diligence process for a contemplated business transaction" between KDC and PGX.  Taylor Decl., Exh. N.

On April 26, 2018, PGX entered into a Master Service Agreement with KDC (the "PGX-KDC Agreement").  Goettig Decl., Exh. K.  In that agreement, KDC represented and warranted that it was a business entity "duly organized and existing under the laws of [KDC's] state … of incorporation, and that it [was] a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States."  *Id.*  Also on April 26, 2018, the parties entered into a Statement of Work calling for the provision of services in connection with Project 2, Lookback 2.  It stated that KDC would provide "Personnel who will perform the duties of Anti-Money Laundering (AML) Investigator."  It stated that KDC would be compensated at a rate of $90 per hour "[i]n return for Contractor's provision of the Personnel."  Taylor Decl., Exh. O.  Curry executed that document as KDC's "Owner/President."  *Id.*

Curry provided services in connection with the Project 2, Lookback 2 Project from April 2018 to August 2018.  Taylor Decl., ¶¶ 19-20; Curry Decl., ¶ 3.  Following the conclusion of his contracts in connection with the Apple Bank projects, Curry provided consulting services to three other clients, ranging in duration from two to six months.  Goettig Decl., Exh. I.

### B.      Bropil Consulting LLC

In April 2018, Bropil Consulting LLC ("Bropil") was invited to provide a response to a request for a proposal to provide AML Investigator services on an independent contractor basis in connection with Project 2, Lookback 2. In response to that request, Bropil submitted a proposal stating that its services included "provid[ing] investigative expertise to major financial institutions under regulatory review for deficiencies in Policies and Compliance procedures pertaining to Banking/Finance Operations, Correspondent Banking, Retail Banking, OFAC, Bank Secrecy Act (BSA), and Bank Bribery Act."  Taylor Decl., Exh. P.  Bropil further represented that it "is

comprised of three (3) employees, with a combined 45 years of Corporate Managerial [and] Administrative experience in the areas of Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) investigations [and] Client On-Boarding and Documentation." *Id.* Bropil proposed a fee of $90 per hour for the services to be provided, but specified that, "should the duties or responsibilities change, the rate would be subject to negotiation." *Id.*

Bropil was[7] a Florida Limited Liability Company formed on August 14, 2013. Goettig Decl., Exh. L. Bropil proposed that, of its three employees, Pilgrim would provide services in connection with Project 2, Lookback 2. In the *curriculum vitae* submitted in connection with Bropil's proposal, Pilgrim was described as having over twenty-eight years of experience "in the areas of Banking/Finance Operations, Correspondent Banking, Compliance, OFAC, Bank Secrecy Act (BSA), Bank Bribery Act, [and] AML/KYC/CIP/CDD regulations," among other things. Taylor Decl., Exh. Q. Pilgrim's CV also summarized ten prior engagements on similar projects with such financial institutions and professional service providers as JPMorgan Chase, HSBC Delaware, and Gibraltar Private Bank & Trust. *Id.* These engagement ranged in duration from a single month to ten months. *Id.*

On the strength of those credentials, PGX entered into a Master Service Agreement with Bropil, effective April 26, 2018 (the "PGX-Bropil Agreement"). Taylor Decl., Exh. R. In that agreement, Bropil represented and warranted that it was a business entity "duly organized and existing under the laws of [Bropil's] state … of incorporation, and that it [was] a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States." *Id.* The parties also entered into a Statement of Work calling for the

---

[7] Pilgrim updated Bropil's status as an active business entity on an annual basis until filing Articles of Dissolution on December 10, 2020, approximately three weeks after PGX articulated an intent to hold Bropil to its contractual commitments. Goettig Decl., Exh. L; Dkt. No. 33.

provision of services in connection with the project, which stated that Bropil would provide "Personnel who will perform the duties of Anti-Money Laundering (AML) Investigator."  It stated that Bropil would be compensated at a rate of $90 per hour "[i]n return for Contractor's provision of the Personnel."  Taylor Decl., Exh. S.  Pilgrim executed the PGX-Bropil Agreement and the Statement of Work as Bropil's "Managing Partner."  Taylor Decl., Exhs. R and S.  On behalf of Bropil as its "Managing Member," Pilgrim also consented to a Business Background Report to be used "as part of the due diligence process for a contemplated business transaction" between Bropil and PGX.  Taylor Decl., Exh. T.

Pilgrim provided services in connection with the Project 2, Lookback 2 for three weeks, from April 2018 to May 2018, before she terminated Bropil's agreement with PGX.  During those three weeks, she provided services for an average of 35.3 hours per week.  Taylor Decl., ¶ 26; December 10, 2020 Declaration of Jacqueline Brown-Pilgrim, Dkt. No. 52 ("Pilgrim Decl."), ¶ 3.

## III.   SETTLEMENT OF THE *BEDIAKO* ACTION

In March 2019, two former AML Investigators filed a lawsuit against Contractor Defendants claiming entitlement to unpaid overtime premiums.  *See* December 10, 2020 Declaration of Julia H. Klein, ("Klein Decl."), Exh. C (the "*Bediako* Action").  Over the following months, additional former contractors joined in the suit, and the parties ultimately reached a settlement resolving the claims of thirteen former contractors.  On August 19, 2020, counsel for the plaintiffs filed the settlement agreement for the court's review and approval pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015).  *See* Klein Decl., ¶ 10, Exh. D. That settlement agreement reads in relevant part as follows:

> Defendants do not admit liability and believe that at all times all putative class members have been properly classified as independent contractors, but the Parties desire to avoid further litigation and to fully, finally, and forever settle, compromise, and discharge all disputes and claims that Representative Plaintiffs or any Opt-in

> Plaintiff raised in the Lawsuit or that relate to or reasonably could
> have arisen out of the same facts alleged in the Lawsuit.

*Id.* Additionally, the agreement "does not constitute any admission of guilt, fault, responsibility, wrongdoing or liability on the part of Defendants or their agents, employees, officers, directors, consultants, clients, or independent contractors." *Id.* The court approved the terms of that settlement agreement and dismissed the action with prejudice on August 31, 2020. Goettig Decl., Exh. M.

## IV.    RELEVANT PROCEDURAL POSTURE

On August 27, 2020, eight days after the settlement agreement was filed in the *Bediako* Action, Plaintiffs commenced this action. During a status conference held on November 20, 2020, counsel for the parties discussed with the Court the prospect of entering into an agreement tolling the limitations period as a way to forego the instant motion until Contractor Defendants interposed a responsive pleading and the Court had decided Apple Bank's anticipated motion for summary judgment. That same day, the Court entered a scheduling order directing the parties to "file a Joint Status Report no later than Wednesday, November 30, 2020, addressing whether all parties assent to a tolling agreement to the date of the filing of Plaintiffs' complaint." Dkt. No. 36. All Defendants later agreed to toll the limitations period in the interest of efficient disposition of upcoming filings. However, on November 30, 2020, counsel for Plaintiffs demanded the right to cancel the tolling agreement at any time unless certain of the Contractor Defendants agreed to waive their contractual rights as to Mazzitelli Consulting LLC, Mazzitelli Consulting Incorporated, KDC and Bropil. *See* Goettig Decl., Exh. N; see also Dkt. No. 38. The Defendants did not agree to those conditions, as they were far outside the scope of the tolling agreement contemplated by the parties and the Court during the November 20, 2020 conference.

On December 21, 2020, Contractor Defendants filed a responsive pleading, which includes crossclaims asserted by GRC and PGX against Mazzitelli Consulting, LLC, Mazzitelli Consulting Inc., KDC, Bropil, and KDC's and Bropil's principals sounding in breach of contract, indemnification and fraudulent transfer.  Dkt. No. 55.

## ARGUMENT

## I.   PLAINTIFFS' RELIANCE ON THE *BEDIAKO* ACTION IS MISPLACED

By Plaintiffs' own admission, this lawsuit was prompted by the fact that they received no payment in connection with the settlement of the *Bediako* Action.  *See* Mazzitelli Decl., ¶¶ 34-35, December 9, 2020 Declaration of Kenneth Curry, Dkt. No. 51 ("Curry Decl."), ¶ 40.  Establishing Plaintiffs' motivation in commencing this action is the *only* relevance that the *Bediako* Action has to this matter.  Beyond that, Contractor Defendants' decision to settle that matter is of absolutely no relevance to this dispute.  To state the obvious, "settlement offers are commonly made where both parties adhere to their positions on the merits, but where settlement nonetheless makes sense as a business matter."  *Hart v. RCI Hospitality Holdings, Inc.*, 90 F. Supp. 3d 250, 286 (S.D.N.Y. 2015), quoting, *inter alia, Playboy Enters., Inc. v. Chuckleberry Pub., Inc.*, 486 F.Supp. 414, 423 n. 10 (S.D.N.Y.1980) ("[T]hat plaintiff settled with PLAYGIRL does not in fact establish what a court would have decided had the parties proceeded to trial.  A host of factors may affect a litigant's decision to settle").  The Court should reject any suggestion that settlement of the *Bediako* Action was in any way an acknowledgment of liability to any of its contracting counterparties, including Plaintiffs.

## II.      THE COURT SHOULD DENY PLAINTIFFS' MOTION TO SEND NOTICE

### A.      Legal Standard

The Court has discretion to decide whether judicial efficiency will be served by permitting notice to be sent to the putative collective. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989).  "As a prerequisite to a collective action, the named plaintiff must demonstrate that he, himself, was a victim of the defendants' illegal pay practices." *Garcia v. Chipotle Mexican Grill, Inc.*, No. 16 cv 601, 2016 WL 6561302, at *4 (S.D.N.Y. No. 4, 2016), quoting *Hanming Feng v. Soy Sauce LLC*, No. 15 cv 3058, 2016 WL 1070813, at *3 (E.D.N.Y. Mar. 14, 2016).  This is because "[t]he court's discretionary power to facilitate the sending of notice to potential class members is premised on its use as a tool for efficient case management, and it does not promote efficient case management to facilitate notice to potential class members where the representative plaintiffs have failed to state plausible FLSA violations." *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 556 (S.D.N.Y. 2013) (internal citation omitted).  "It makes little sense to certify a collective action based on manifestly deficient pleadings, *i.e.*, ones insufficient to make out a violation of the FLSA." *Id.*; see also *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 105 (S.D.N.Y. 2003) ("*Once the Plaintiff makes a colorable claim for relief*, the only inquiry necessary is whether the potential plaintiffs to be notified are similarly situated to the named plaintiff") (emphasis added).

While Plaintiffs' burden at the conditional certification stage is modest, "it is not non-existent" and certification "is not automatic." *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 443 (S.D.N.Y. 2012), quoting *Guillen v. Marshalls of MA, Inc.* ("*Guillen I*"), 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010) ("the burden is not non-existent and the factual showing, even if modest, must still be based on some substance").  Specifically here, Plaintiffs' burden is to set

forth evidence "sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that *violated the law*." *Hoffman v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997).  To do so, Plaintiffs cannot merely point to similarities that are *unrelated* to the underlying inquiry whether they (and the collective) were properly classified as independent contractors and not employees.  Rather, they must identify facts which demonstrate that they and the collective are "similarly situated with respect to their allegations that *the law has been violated*." *Young v. Cooper Cameron Corp.,* 229 F.R.D. 50, 54 (S.D.N.Y. 2005) (citing *Krueger v. N.Y. Tel. Co.*, Nos. 93 cv 178 & 179, 1993 WL 276058, at *2 (S.D.N.Y. July 21, 1993)) (emphasis added and internal citation omitted).

## B.   Plaintiffs' Submissions Do Not Demonstrate Existence of an Unlawful Policy

### 1.   Allegations of a Common Classification are Not Sufficient

The mere allegation that Defendants classified Plaintiffs and others as independent contractors does not justify Court-authorized notice, because it "is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Brown v. Barnes and Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017), quoting *Jenkins v. TJX Companies, Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) and denying motion for conditional certification and collecting similar cases where plaintiffs "could only show a common presumptively legal official policy." This is especially relevant here, where Plaintiffs are under a duty to present competent evidence to satisfy the threshold issue of whether they are entitled to invoke the FLSA's protections in the first place.  *Browning v. Ceva Freight, LLC*, 885 F.Supp.2d 590, 597 (E.D.N.Y. 2012) ("Independent contractors are not covered by the FLSA") (internal quotes omitted).

2.    *Plaintiffs' Declarations Do Not Address the Economic Realities of the Parties' Relationship*

Many of the factual assertions set forth in Plaintiffs' memorandum of law and declarations are conclusory, misleading, incomplete, or internally inconsistent.  However, when taken in tandem with their prior statements in connection with their pitches for work on the lookback projects, they compel the conclusion that Plaintiffs have not demonstrated an entitlement to the protections of the FLSA.

In cases where the plaintiffs allege that they were misclassified as independent contractors, the overriding consideration under the FLSA is the "economic reality" of the relationship – specifically, whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."  *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988).  "Regardless of what factors the court chooses to consider, based on the individual facts of the case, the ultimate question is whether the putative employee is economically dependent on the putative employer."  *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d, at 608. "In short, if the Plaintiffs were in business for themselves, they were not employees; [i]f they were economically dependent on and within the direct control of [a defendant], they were employees." *McGuiggan v. CPC Intern., Inc.*, 84 F. Supp. 2d 470, 479-80 (S.D.N.Y. 2000).

Here, Plaintiffs' declarations distort the economic realities of their relationships with Defendants.  According to Plaintiffs, the fact that GRC and PGX engaged contractors through their business entities weighs in favor a finding of an unlawful practice.  *See* Mazzitelli Decl., ¶ 33 (contractors "were required to form their own business entities"), Curry Decl., ¶ 8 ("P&G and GRC required me to enter into a Master Subcontractor Agreement ('MSA') through an entity I had created called KDC Consulting, LLC"); Pilgrim Decl., ¶ 3 ("PGX required me to work through a limited liability company that I created called Bropil Consulting LLC").  This gets the law and the

facts precisely wrong.  The investment of time and resources attendant to establishing a business entity *supports* a finding that individuals are in business for themselves.  This is emphatically not a case in which a plaintiff "formed a corporation at the request of and for the sole purpose of serving the [defendant]."  *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 325 (S.D.N.Y. 2001).  On the contrary, Mazzitelli Consulting LLC was formed in 2011 – *six years* before Project 1.  KDC was formed well over a year prior to Project 1, and submitted to GRC proof of its own insurance as a business expense.  Bropil was formed in August 2013 – almost *five years* before entering into the PGX-Bropil Agreement, and had three employees.  The Court should not countenance Plaintiffs' specious argument that the existence of their respective business entities supports rather than rebuts their claim of entitlement to the FLSA's protections.

What's more, documents and submissions in the record to date illustrate the time-limited nature of the parties' relationship.  "Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration."  *Saleem v. Corporate Trans. Group, Ltd.*, 52 F.Supp.3d 526, 542-43 (S.D.N.Y. 2014) (internal citation omitted).  As evidenced by each of the Statements of Work signed by the Plaintiffs, they understood the temporary, project-based nature of the lookback projects (and indeed, Bropil's engagement ended well before the anticipated conclusion of the Project 2, Lookback 2); see also Mazzitelli Opposition Decl., ¶ 31 ("GRC hired me solely for [Project 1, Lookback 2]").  Plaintiffs have offered nothing to distinguish this matter from their many prior and subsequent engagements with other clients.  This factor too fails to demonstrate that Plaintiffs (or anyone else to whom they claim to be similarly situated) may invoke the protections of the FLSA.

In sum, the only common ground that Plaintiffs claim to have with the purported collective was that they had all formed business entities in connection with services they offered to financial institutions, worked long hours on a time-limited project and strove to keep their contracting counterparties satisfied. In other words, they were small business owners. Because Plaintiffs have not – and cannot – show that they or any other contractor were victims of an *unlawful* policy, the Court should deny Plaintiffs' motion to authorize notice of pendency of this action.

### C.     The Notice and Related Documents are Fatally Defective

The Court should also deny Plaintiffs' motion because their proposed notices and reminders are improper in multiple material respects.[8]

<u>First</u>, all references to "employment" or "being employed" are improper. For example, Plaintiffs' proposed statement of Defendants' position states that Defendants "maintain that they have fully complied with all of the federal and state wage and hour laws at issue, and that no current or former employees are legally entitled to any additional compensation." Klein Decl., Exh. E. This implies that Defendants were under a duty to comply with wage and hour laws in the first instance – which is not the case in light of Plaintiffs' status as independent contractors. Contractor Defendants adamantly deny that the Plaintiffs or any other contractor are employees, nor has the Court made any such determination, and thus, the notice should not appear to give any suggestion that the issue of independent contractor versus employee status has been resolved. Similarly, reference to Defendants "firing" anyone for taking part in the case is misplaced, not only because it improperly suggests an employment relationship but also because Project 2 concluded years ago.

---

[8] If the Court decides that notice is appropriate, Defendants respectfully request that the parties be ordered to meet and confer to prepare a mutually agreeable notice and consent to join form based upon the Court's certification order. In the event the parties cannot agree, Defendants request the opportunity to submit their own proposed notice and opt-in procedures.

Second, the notice does not advise potential plaintiffs of the possibility that they or their business entities may be held liable for costs associated with this lawsuit, and for potential crossclaims which could be asserted, as it should.  *Melgadejo v. S&D Fruits & Vegetables, Inc.* No. 12 cv 6852, 2013 WL 5951189, at \*5-6 (S.D.N.Y. Nov. 7, 2013).

Third, the notice fails to advise potential plaintiffs of potential tax issues so that they can "make an informed decision on whether to opt in to the FLSA or exclude themselves from the New York Labor Law class action." *Brown v. Mustang Sally's Spirits and Grill, Inc.*, No. 12 cv 00529S, 2012 WL 4764585, at \*4 (W.D.N.Y. Oct. 5, 2012).

Fourth, the notice fails to advise potential plaintiffs of their possible obligations with regard to participating in the lawsuit, including but not limited to participating in discovery, being deposed, and testifying at trial.  Courts in this District have commonly approved requests for such language.  *See, e.g., Whitehorn v. Wofgang's Steakhouse, Inc.,* 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011) (language notifying prospective class members of "the possibility that they will be required to participate in discovery and testify at trial . . . is routinely accepted").

Fifth, the collective action period should be measured back from the date of any notice to be mailed.  The statute of limitations on a putative collective action member's claim continues to run until the individual consents to join the action.  29 U.S.C. § 256; *Gordon v. Kaleida Health*, No. 08 cv 78S, 2009 WL 3334784, at \*12 (W.D.N.Y. Oct. 14, 2009).  The opt-in may therefore only obtain FLSA damages, at maximum, for the three-year period[9] preceding the filing of the consent to join.  Sending notice to contractors whose claims are time-barred does not serve the interest of the individuals, the parties or the court.

---

[9] Contractor Defendants expressly reserve the right to move for summary judgment on grounds that the FLSA's two-year limitations period applies to Plaintiffs' claims, in light of the fact that GRC and PGX had ample reasonable, good-faith basis for relying upon Plaintiffs' representations that they were professional consultants operating their own businesses.

Sixth, Plaintiffs' proposed notice is overly broad.  In the Complaint, Plaintiffs purport to represent "persons who work or have worked as AML [Investigators]s and [Team Leads] who elect to opt-into this action" – and make no reference to QA Reviewers.   Complaint, ¶ 56. However, even if the FLSA collective were limited to AMLs and Team Leads for both projects, such a collective remains overly broad.  Mazzitelli was a Team Lead[10] in Project 1 (Mazzitelli Decl., ¶ 2), and Curry was an AML Investigator[11] in both Project 1 and Project 2 (Curry Decl., ¶ 2).   Pilgrim was an AML Investigator in Project 2 only.  Pilgrim Decl., ¶¶ 2-3.  According to Mazzitelli, Project Manager "Deepa Keswani Tekchandani did not return for" the Project 2, and "[i]nstead, Toni Weintraub became the Project Manager."  Mazzitelli Opposition Decl., ¶¶ 70-71. Moreover, GRC was the contracting counterparty with Mazzitelli and KDC for Project 1, and PGX contracted with KDC and Bropil for Project 2.  As such, Mazzitelli is not similarly situated to any Team Leads in that second project.  By Mazzitelli's and Curry's own description of their roles in connection with the projects, the duties of Team Lead are radically different from those of AML Investigator.  *Compare* Goettig Decl., Exh. D and I.  Accordingly, the scope of Plaintiffs' proposed notice is defective in light of the fact that their declarations "fail[] to show that the other members of [the] proposed class had similar duties, responsibilities, and lines of supervision."  *Reyes v. Nidaja, LLC*, No. 14 cv 9812, 2015 WL 4622587, at *3  (S.D.N.Y. Aug. 3, 2015), discussing *Qi Zhang v. Bally Produce, Inc.*, No. 12 Civ. 1045, 2013 WL 1729274 (S.D.N.Y. Apr. 22, 2013).

Seventh, Plaintiffs' request to e-mail and text the notice is unwarranted.   Plaintiffs' argument that the advent of COVID-19 supports the delivery of notice by alternative means is unpersuasive, in light of the fact that interstate travel is discouraged and people are encouraged to

---

[10] Plaintiffs' moving memorandum inaccurately states that Mazzitelli was engaged as an AML.  Compare Moving MOL, at 8 and Mazzitelli Decl., ¶ 2.
[11] Plaintiffs' moving memorandum inaccurately states that Curry held the titles of AML and QA.  Compare Moving MOL, at 2 and Curry Decl., ¶ 2.

stay at their homes.  Indeed, there has likely never been a time in recent history when delivery by First Class Mail is *more* likely to find its intended recipient than now.  Moreover, the proposed form of the text message suffers from many of the same defects enumerated above, including but not limited to its overbreadth, its reference to employment and its failure to provide notice of the possibility of tax implications and crossclaims.  Klein Decl., Exh. F.

Seventh, Plaintiffs' proposed reminder notice does not state prominently that the Court neither encourages nor discourages participation in the lawsuit, and as such may be misconstrued as encouraging involvement in the litigation.  *Lopes v. Heso, Inc.*, No. 16 cv 6796, 2017 WL 4863084, at *8 (E.D.N.Y. Oct. 27, 2017).

Eighth, Plaintiffs' proposed period of 90 days is well beyond the standard in this jurisdiction.  *See Racey v. Jay-Jay Cabaret, Inc.*, No. 15 cv 8228, 2016 WL 3020933, at *7 (S.D.N.Y. May 23, 2016); *Velasquez v. Digital Page, Inc.*, No. 11 cv3892, 2014 WL 2048425, at *12 (E.D.N.Y. May 19, 2014) ("[c]ourts routinely restrict the opt-in period to sixty days").

Contractor Defendants reserve their remaining objections to Plaintiff's proposed notice and opt-in procedure until after the Court's decision on the instant motion, if necessary.

## III.    THE COURT SHOULD NOT EQUITABLY TOLL THE LIMITATIONS PERIOD

If the Court authorizes notice of pendency (which it should not do), there is no basis upon which to equitably toll the FLSA's limitations period.  "[E]quitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass v. New York City Transit Auth,* 333 F.3d 74, 80 (2d Cir. 2003) (internal quotes omitted).  It is "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  *Wallace v. Kato,* 549 U.S. 384, 396 (2007).  The Court should not grant such extraordinary relief.

"When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) 'has acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass*, 333 F.3d at 80-81 (internal quotes omitted).  Plaintiffs' arguments that potential opt-in plaintiffs are entitled to such relief fall flat.  Even if they were entitled to receive wage-and-hour notices under the New York Labor Law (which they were not), "Courts in this Circuit have denied requests for equitable tolling where plaintiffs rely only on defendants' failure to notify plaintiffs of their rights, 'as it would provide for equitable tolling whenever a defendant violated FLSA and NYLL by failing to post notices or provide statements of hours and wages.'" *Rotari v. Mitoushi Sushi, Inc.*, 448 F.Supp. 3d 246, 254 (E.D.N.Y. 2020) (citing, *inter alia*, *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 480 (S.D.N.Y. 2008)).  GRC and PGX categorically reject any retaliatory motivation in asserting crossclaims against the Plaintiffs' business entities – and in any event, Plaintiffs fail to draw any logical connection between those crossclaims and equitable tolling for potential opt-in plaintiffs.  And finally, to the extent that potential plaintiffs were aware of the *Bediako* Action, such awareness *cuts against* equitable tolling, insofar as, by their inaction to date, they have not acted with reasonable diligence during the time period at issue.  *See, e.g., Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 318-19 (S.D.N.Y. 2011).  In short, there is nothing remarkable about the procedural posture of this case that would warrant such extraordinary relief.  "If Congress wanted to toll the statute of limitations for opt-in plaintiffs under the FLSA as a means of avoiding the very scenario that plaintiff argues warrants equitable tolling here, Congress would have included such a provision in the statute." *Rotari*, 448 F.Supp. 3d at 254.

Moreover, in this case, Defendants *offered* to toll the limitations period in the interest of efficient administration of this matter so that Contractor Defendants would have time to file a responsive pleading and the Court could address Apple Bank's anticipated motion for summary judgment – both of which have now been filed, further complicating the process of providing adequate notice of pendency of this action.  Plaintiffs have no basis upon which to move the Court to grant to them relief that their attorney has already rejected.

## **CONCLUSION**

Issuing notice of pendency to potential plaintiffs at this stage would not serve the interests of judicial efficiency.  Plaintiffs' motion for conditional certification and related relief should therefore be denied.

Dated: New York, New York
       February 1, 2021

DAVIS WRIGHT TREMAINE LLP

By: s/_____
    Michael J. Goettig
    Lyle S. Zuckerman
    1251 Avenue of the Americas, 21st Floor
    New York, New York 10020
    (212) 489-8230
    *Counsel for Defendants*
    *P&G Auditors and Consultants, LLC, GRC*
    *Solutions, LLC and PGX, LLC*
    *and Crossclaim Plaintiffs GRC Solutions, LLC and*
    *PGX, LLC*