# Exhibit E

KLEIN LAW GROUP OF NEW YORK PLLC
120 East 79th Street, Suite 1A
New York, New York 10021
(347) 292-8170
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH CURRY, RICARDO MAZZITELLI, JACQUELINE BROWN PILGRIM, on behalf of themselves and other similarly situated, | |
| Plaintiffs, | |
| - against - | |
| P&G AUDITORS AND CONSULTANTS, LLC; GRC SOLUTIONS, LLC; PGX, LLC; AND APPLE BANCORP, INC. d/b/a APPLE BANK FOR SAVINGS, | |
| Defendants. | |

**DECLARATION OF PLAINTIFF RICARDO MAZZITELLI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Ricardo Mazzitelli, hereby declare under penalty of perjury that the following is true:

1. My name is Ricardo Mazzitelli, I am over the age of 18 years old, and I am currently a resident of Miami-Dade County, Florida.

2. On or around June 13, 2017, I entered into a Master Service Agreement ("MSA") and Statement of Work ("SOW") with GRC, LLC ("GRC") to work as an Anti-Money Laundering Quality Assurance ("QA") analyst for Defendant Apple Bancorp, Inc. ("Apple Bank") on a project known as "Lookback Review Phase 1." Two weeks into my employment I was promoted to Control Team Lead ("TL") for Lookback Review Phase 1.

3. There were multiple phases included in this project, but all phases were parts of the same anti-money laundering project.

4. In order to be eligible to work on this project, GRC required me to work through a limited liability company that I created called Mazzitelli Consulting, LLC.

5. GRC paid me, through Mazzitelli Consulting, LLC.

6. For this project, GRC employed Anti-Money Laundering investigators (AMLs), Anti-Money Laundering Quality Assurance (QAs) and TLs, all of whom were selected by GRC.

7. From my discussions with TLs, who worked on this project, including Felicia R., Keith W., and Marvin W., GRC did not pay any TLs directly; rather GRC required every single TL to have a company and paid that Company based on the hours each TL worked.

8. From my discussions with QAs who worked on this project, including David B., Urim L., Luis L., GRC did not pay any QAs directly; rather GRC required every single QA to have a company and paid that Company based on the hours each QA worked.

9. From my discussions with AMLs who worked on this project, including Kenneth Curry, Lisa G., Erik K., Rhonda B., Ed C., Bruce C., Dvong, Lucy H., Ludger J.-C., Richard N., Devika R., Ravi S., Akshay V., Dominic V., Jim V., Anthony W., Brian Z., Tim B., Naem B., Dustin P., GRC did not pay any AMLs directly; rather GRC required every single AML to have a company and paid that Company based on the hours each AML worked.

10. From my discussions with TLs, QAs, and AMLs who worked on this project, including those listed above, each TL, QA and AML had to have, or were asked to create his or her own company.

11. In connection with the Lookback Review Phase 1 project, GRC sent me to work at the Apple Bank branch located at 2100 Broadway, at West 73rd Street in Manhattan that was owned and/or operated by Defendant Apple Bancorp, Inc. d/b/a Apple Bank for Savings.

12. During this period, I worked exclusively for Defendants as a Team Lead; with the exception of the two weeks I worked as a QA.

13. I worked alongside several dozen other AMLs, QAs, and TLs. These AMLs and I worked extremely long hours. I was required to work at least 40 hours, but in reality GRC required me to work a minimum of 65 hours per week and throughout the duration of my employment, I logged approximately 73 hours each week working for GRC and Apple Bank.

14. I recall working late into the night and on weekends on a regular basis throughout the project.

15. GRC monitored the hours logged and required TLs to ask QAs and AMLs to work additional hours if their hours were anticipated to fall below the 65 hour minimum.

16. Because I worked alongside the other TLs, QAs and AMLs I observed dozens and dozens of TLs, QAs, and AMLs work the same or substantially similar hours as I did, and I can attest that virtually all AMLs worked much more than 40 hours per week. AMLs who worked these long hours include Kenneth Curry, Lisa G., Erik K., Rhonda B., Ed C., Bruce C., Dvong, Lucy H., Ludger J.-C., Richard N., Devika R., Ravi S., Akshay V., Dominic V., Jim V., Anthony W., Brian Z., Tim B., Naem B., Dustin P. QAs who worked these long hours include David B., Urim L., Luis L. TLs who worked these long hours include Felicia R., Keith W., and Marvin W.

17. Every Friday, I was instructed by the project manager to ask each AML in my team to commit to working at least one day of the weekend, in order for the team do increase production.

18. On the last three weeks of the project, I worked every day without a break in order to achieve our project goal and complete our review.

19. While working on this project, I, and my fellow TLs, QAs and AMLs, used Apple Bank's facilities, computers, paper, IT, and information to perform our jobs.

20. Apple Bank alone controlled my access to the branch, as well as the access of my fellow TLs, QAs, AMLs and managers had, to the information and data necessary to perform our jobs.

21. To my knowledge, nobody from GRC, PGX or P&G could provide access to the necessary information and data, as Apple Bank strictly controlled all such access.

22. If Apple Bank restricted my access to its information and systems, I would be unable to perform any of the tasks assigned to me. Apple Bank's IT provide our team with access to their data platform and provided the team members with unique logon information to review the data.

23. In addition to terminating employees who failed to work the minimum number of hours, GRC routinely terminated employees who underperformed as to the quantity and/or quality of their work.

24. If I was unable to perform my assigned work because Apple Bank refused to allow access, I believe that GRC would have terminated me.

25. I understood my employment to be limited to the Lookback Project I referenced in the agreement I signed with GRC and I had no expectation of being able to be reassigned to any other GRC project with Apple Bank or otherwise.

26. Apple Bank was aware of my presence at the worksite, and also aware of my fellows TLs, QAs and AMLs presence at the bank, as they kept their facilities open for us on

weekends, holidays and after business hours, and they also hired security to allow us to work at the bank.

27. The branch where the Lookback Project I was conducted is a fully functioning Apple Bank branch with bank employees, security guards and managers. The security guards would open the facilities prior to normal business hours so that the team could start work before 9:00 AM, and kept the branch open after normal closing hours so that we could work longer hours. In addition, Apple Bank maintained security on site for the weekends, when the branch is normally closed, and opened the branch on Saturdays and Sundays for the Lookback Project.

28. As a condition of my employment, I was required to sign Apple Bank's "acceptable use policy," which, among other things, set forth the terms and conditions I was required to abide by in order to use Apple Bank's information technology resources. I am aware that other TLs, QAs and AMLs who worked on the Apple Bank project had to sign Apple Bank's "acceptable use policy" as well.

29. I believe that I would have been terminated by Apple Bank, or that Apple Bank would effectively terminate me by preventing GRC from completing my on-boarding process, had I failed to sign their "acceptable use policy."

30. While I was working on the Apple Bank Project, I understood that if I violated the "acceptable use policy," I would be terminated either by GRC of its own accord, or by GRC at the direction of Apple Bank.

31. GRC hired me solely for Apple Bank's Lookback Review Phase 1 project and I understood that GRC would not shift me to another project if my on-boarding process was incomplete.

32. After my involvement with Apple Bank's Lookback Review Phase 1 project, GRC did not shift me to another project, nor did they offer to do so.

33. Except for those employees who were re-hired for Phase II of the Apple Bank Lookback Review Project, I do not know of any other person or group of people who were moved to another project through the Contractor Defendants upon termination from the Apple Bank Project.

34. While I remained in contact with some of my colleagues from the Apple Bank Project, I have never jointly sought employment with any of them as part of a group.

35. Neither GRC, nor PGX, nor P&G contacted me for any other projects after the Apple Bank project.

36. I got paid directly by GRC, but only after we submitted our hours using an online portal provided by GRC. I did this from my computer terminal at the Apple Bank branch where I was assigned. Speaking with various co-workers, it is my understanding that they also got paid directly by GRC only after submitting time through the GRC portal. It is also my understanding that GRC provided all TLs, QAs and AMLs with a training document called "Time Tracking through the Portal," which instructed us how to get paid by entering our time records into the system.

37. The hour tracker was a GRC portal that GRC gave each of us a unique login code so that we could input the hours for each week we worked; we did this at the end of each week as directly instructed by GRC.

38. Upon information and belief, the Contractor Defendants submitted these time sheets to Apple Bank for review and to ascertain how much money Apple Bank owed the Contractor Defendants to pay for our services.

39. Upon information and belief both the Contractor Defendants and Apple Bank routinely retained copies of AMLs', QAs' and TLs' time sheets and reviewed them against the work performed by each AML, QA and TL during that week. If an AML, QA or TL logged in a lot of hours but did not finish a lot of work, he or she would be asked to do average more work per hour; failure to do so could lead to termination.

40. For the duration of this project, GRC paid me at the flat rate of $110.00 per hour.

41. Although GRC and, I believe, Apple Bank, required me to work more than 40 hours per week, there was no provision in the agreement to pay me a time and half premium for each hour beyond 40 that I worked.

42. Indeed, I estimate that I worked approximately 73 hours per week in each week that I worked for GRC and Apple Bank and in that time, I never received overtime premiums.

43. My long work hours were not an anomaly. I personally observed many of my TL, QA, and AML colleagues work the same long hours that I did.

44. Having spoken to various colleagues during my time working on this project, including those listed above, I know that GRC and Apple Bank did not pay any TLs, QAs or AMLs overtime premiums. Instead, they paid all of us at the flat hourly rate they contracted with us that appeared in our MSAs or SOWs.

45. It is my understanding that Apple Bank contracted exclusively with the Contractor Defendants to provide anti-money laundering compliance review for the Lookback project that occurred during this time frame.

46. Apple Bank also contracted with another consulting firm that used its own salaried employees for a different project but those employees did not work on-site with us.

47. Although our Lookback Project differed from the other project, there was some overlap between the two projects, as I recall having to communicate with employees on the other project about substantive issues.

48. To my knowledge, the employees of the other consulting firm did not work the same long hours that we did.

49. My contact with the other consulting firm was at Apple Bank's direction.

50. All communications with the Apple Bank compliance department and the other consulting firm were conducted via Apple Bank's email service, which we had access created by Apple Bank's IT team. I believe that the name of the consulting firm was Protiviti Inc.

51. Because I worked so many long hours, I could not work in another project through the duration of my employment on this project.

52. Throughout my employment period, GRC, directed and controlled my work. The work performed by AMLs was reviewed by QAs, who were similarly employed by GRC. AMLs and QAs were supervised by TLs, who were also employed by GRC. TLs received their instructions from GRC, including Deepa Keswani Teckchandani, a project manager for GRC.

53. During my tenure with Apple Bank in Phase I of the Project, the project manager changed three times but the changes did not affect Project operations.

54. In Phase I of the Project, my colleagues and I reviewed Apple Bank's customer's "alerted" transactions for suspicious activity using guidelines set by the Financial Crimes Enforcement Network (FinCEN), the division of the Treasury Department that analyzes money laundering in US financial institutions.

55. The requirement that a Suspicious Activity Report ("SAR") be filed with FinCEN within 30 days of determining activity to be "suspicious;" known in the compliance profession as

the "30 day clock" (meaning that a financial institution only has 30 days to file a SAR once a suspicious activity has been detected). Apple Bank's compliance department reviewed our escalated reports and filed SARs accordingly.

56.   If a financial institution fails to file a SAR within 30 days of determining activity to be suspicious, a financial institution could be subject to fines by banking regulators. Therefore, whenever our team (the Lookback Project) identified activity deemed to be suspicious, we would escalate the report as soon as possible to Apple Bank's compliance department so that they could meet the 30 day filing clock.

57.   GRC data analyst, who were also paid on an hourly basis without overtime, but who were not AMLs, QAs or TLs, would retrieve data from Apple Bank's system and create spreadsheets for AMLs, QAs or TLs to review.

58.   The workers who retrieved the data were in direct contact with Apple Bank staff.

59.   After reviewing an "alerted" transaction, AMLs would close the transaction if it was found to be not suspicious under FinCEN guidelines.

60.   If the "alerted" transaction was determined to be suspicious, the AML would write a narrative regarding the nature of the suspicious activity and escalate it immediately for review by QAs, TLs, and ultimately, Apple Bank.

61.   Due to the sensitive nature of the "30 Day Clock," the Lookback Project would escalate the suspicious reports to Apple Bank as soon as possible so that Apple Bank compliance could file the required SAR with FinCEN.

62.   Our work product was ultimately reviewed and used by both GRC and Apple Bank in furtherance of Apple Bank compliance obligations.

63. Apple Bank reviewed our escalation reports, or was expected to review, and Apple Bank compliance would file the SAR with FinCEN.

64. GRC repeatedly stressed that all suspicious activity had to be escalated to Apple Bank immediately to allow the bank's compliance department to review and confirm the conclusion of the escalation and not miss the 30 Day Clock deadline, or otherwise, the bank could face a fine

65. Apple Bank sometimes provided comments and corrections to our reports on an ad hoc basis, but we received feedback about our SARs at least on a daily basis.

66. Apple Bank's comments would be provided to Deepa Keswani Teckchandani, Toni Weintraub, or the QC Team who would then communicate the critiques to the other team members.

67. While the critiques covered a variety of topics, the feedback dealt exclusively with SAR escalations; the sufficiency of the due diligence performed; whether customer identification program (CIP) information was missing from the analysis; and whether the SAR narrative was sufficiently detailed.

68. Apple Bank had its own compliance staff who I believed performed essentially the same functions as AMLs, QAs, and TLs did.

69. Based on my conversations with other AMLs, QAs, and TLs including those listed above, they were required to form their own entities, sign virtually identical MSAs, work more than 40 hours a week, and nobody was paid overtime premiums for work in excess of 40 hours per week.

70. After Phase I of the Apple Bank Lookback Project ended, Deepa Keswani Teckchandani did not return for Phase II.

71. Instead, Toni Weintraub became the Project Manager.

72. A few of my colleagues from Phase I were asked to return for Phase II, but those who were not, myself included, had to apply for other positions with other banks and consulting firms.

73. I was aware of a lawsuit against the Contractor Defendants called *Damani Bediako and Kia Miller, et al. v. P&G Auditors and Consultants, LLC, et al.*, Case No. 1:19-cv-02527. This case alleges the same overtime violations I am now currently alleging and because it was pled as a collective action, I thought that I would have the opportunity to participate in the case and even attempted to contact Plaintiff's counsel. However, no notice was ever sent out and this case settled for approximately $250,000.00. I did not receive any recovery from this lawsuit. To my understanding only 13 former AMLs or TLs received compensation from this settlement agreement.

74. I do not recall ever seeing or receiving any wage and hour notices or receiving any rate of pay notices as part of my employment with Defendants.

75. On December 7, 2020, I received a packet addressed to Mazzitelli Consulting, Inc. The packet included a copy of the complaint in this matter along with a letter signed by "GRC Solutions, LLC" and dated November 30, 2020. The letter purported to be notifying the Vice-President of Mazzitelli Consulting, Inc. of GRC's intent to file claims against Mazzitelli Consulting, Inc. as an "alter ego of Mazzitelli Consulting LLC."

76. The GRC letter also claimed to have included "Correspondence to Mazzitelli Consulting LLC" along with a copy of the complaint, but I did not find any correspondence in the envelope.

77. I believe that GRC was attempting to intimidate me and pressure me into dropping my claims against them.

Dated: January 19th, 2021

_____
Ricardo Mazzitelli