UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENNETH CURRY, RICARDO MAZZITELLI,
JACQUELINE BROWN PILGRIM, on behalf of
themselves and others similarly situated,

                              Plaintiffs,                    CIVIL ACTION NO.: 20 Civ. 6985 (LTS) (SLC)

        -v-                                                  **OPINION & ORDER**

P&G AUDITORS AND CONSULTANTS, LLC; GRC
SOLUTIONS, LLC; PGX, LLC; AND APPLE BANCORP,
INC. D/B/A APPLE BANK FOR SAVINGS,

                              Defendants.

**SARAH L. CAVE**, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiffs Kenneth Curry, Ricardo Mazzitelli, and Jacqueline Brown Pilgrim ("Plaintiffs")

filed this putative class and collective action asserting claims under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201–19, and the New York Labor Law, NYLL § 650 et seq. ("NYLL"), against

Defendants P&G Auditors and Consultants, LLC ("P&G"), GRC Solutions, LLC ("GRC"), PGX, LLC

("PGX") (P&G, GRC, and PGX, the "Contractor Defendants"), and Apple Bancorp, Inc. (the "Bank")

(the Contractor Defendants and the Bank, "Defendants").  (See ECF No. 1 (the "Complaint")).

Plaintiffs allege that Defendants employed them as anti-money laundering investigators

("AMLs"), team leads ("TLs"), and quality assurance reviewers ("QAs") but failed to pay them

requisite overtime compensation in violation of the FLSA.  (ECF No. 1 ¶ 1).  Plaintiffs seek to

recover: (1) unpaid overtime wages; (2) liquidated damages; (3) statutory penalties under the

NYLL; (4) pre- and post-judgment interest; and (5) attorneys' fees and costs.  (Id. at 22–23).

Before the Court is Plaintiffs' Motion for Collective Action Certification (the "Collective Motion" (ECF No. 48)).  Plaintiffs ask the Court to grant conditional certification of their FLSA claim as a collective action on behalf of all AMLs, TLs, and QAs whom the Contractor Defendants sent to work on all phases of the Bank's two lookback projects (discussed further below) (the "Proposed Collective").  (ECF No. 53 at 10).  Defendants oppose the Collective Motion.  (ECF Nos. 80 – 84-14).  For the reasons set forth below, the Collective Motion is GRANTED IN PART AND DENIED IN PART.

## II. <u>BACKGROUND</u>[1]

### A.  <u>Factual Background</u>[2]

#### 1.  <u>Defendants</u>

P&G, GRC, and PGX provide "internal audit and risk management services for community banks, credit unions, foreign branches[,] and agencies . . . ."  (ECF No. 1 ¶¶ 72–74).  In a Consent Order dated December 16, 2015 (the "Consent Order"), the Federal Deposit Insurance

---

[1] In connection with the Collective Motion, I have considered:  the Complaint (ECF No. 1); the Declaration of Julia H. Klein, Esq. in support of the Collective Motion ("Klein Declaration") and attached exhibits (ECF Nos. 49 – 49-10); the Declaration of Ricardo Mazzitelli in support of the Collective Motion ("Mazzitelli Declaration") (ECF No. 50); the Declaration of Kenneth Curry in support of the Collective Motion ("Curry Declaration") and attached exhibits (ECF Nos. 51 – 51-4); the Declaration of Jacqueline Brown Pilgrim in support of the Collective Motion ("Pilgrim Declaration") and attached exhibit (ECF Nos. 52 – 52-1); Plaintiffs' memorandum of law ("Plaintiffs' Memo of Law") and reply memorandum of law ("Plaintiffs' Reply") (ECF Nos. 53, 90); Apple's memorandum of law ("Apple Memo of Law") in opposition to the Collective Motion (ECF No. 80); the Declaration of Dean G. Yuzek in opposition to the Collective Motion ("Yuzek Declaration") and attached exhibits (ECF Nos. 81 – 81-2); P&G and GRC's memorandum of law in opposition to the Collective Motion ("P&G Memo of Law") (ECF No. 82); the Declaration of Melissa Taylor in opposition to the Collective Motion ("Taylor Declaration") and attached exhibits (ECF Nos. 83 – 83-20); and the Declaration of Michael J. Goettig in opposition to the Collective Motion ("Goettig Declaration") and attached exhibits (ECF Nos. 84 – 84-14).

[2] Defendants have disputed Plaintiffs' claims and deny any liability (<u>see</u> ECF Nos. 19, 41, 91), and therefore, nothing in the Factual Background should be deemed as a conclusive determination of any facts in this action.

Corporation required the Bank to validate its system for monitoring suspicious activity through a review of all customer accounts and transaction activity for the period October 1, 2014 through December 16, 2015.  (ECF No. 49 ¶ 17).  Shortly thereafter, on January 29, 2016, the Bank entered a Memorandum of Understanding ("MOU") with the New York State Department of Financial Services to conduct a similar review.  (Id. ¶ 18).  To fulfill its obligations under the Consent Order and MOU, on April 14, 2016, the Bank engaged GRC to provide a "BSA/AML Transaction Look Back Review" ("Project 1").  (ECF No. 84-1).[3]  Relevant here is the second phase of Project 1, which took place from July 2017 until February 2018 and "involved the on-site analysis of the financial activities of certain Apple Bank account holders to identify suspicious financial activity." ("Project 1/Lookback 2").  (Id.; ECF No. 82 at 8).  GRC conducted due diligence on professionals it considered for Project 1/Lookback 2, including conducting background checks.  (ECF No. 83 ¶ 3; see ECF Nos. 83-2; 83-8).  As discussed further below, Mazzitelli and Curry were two of the professionals who worked on Project 1/Lookback 2.  (ECF Nos. 82 at 8; 83 ¶¶ 4–9, 12–15). Project 1/Lookback 2 concluded in February 2018.  (ECF No. 83 ¶ 8).

On March 27, 2018, a month after Project 1/Lookback 2 concluded, the Bank and GRC entered into a master services agreement "to govern their relationship from that point forward." (ECF Nos. 82 at 14; 84-10)  On April 6, 2018, GRC provided the Bank with a proposal for services as part of a second lookback project into "customer activity associated with checks, internal transfers, and monetary instrument transactions" between December 15, 2015 through December 31, 2016 ("Project 2").  (ECF No. 83-12 at 2).  Project 2, which ran from April 2018 until August 2018, covered the time period following that covered by Project 1, and involved a

---

[3] BSA refers to the Bank Secrecy Act, 31 U.S.C. § 5311.

different project manager, and different "subject-matter experts," although with the same area of expertise, i.e., AML and BSA.  (ECF Nos. 82 at 14; 84-5[4] ¶¶ 70–72).  Relevant here is the second phase of Project 2 ("Project 2/Lookback 2"), for which PGX solicited subject-matter experts to perform the review services.  (ECF No. 83 ¶ 17).  Like GRC did for Project 1/Lookback 2, PGX conducted due diligence on the professionals it considered for Project 2/Lookback 2, including performing background checks. (ECF Nos. 82 at 14–15; 83-14).  As discussed further below, Curry and Brown Pilgrim were two of the professionals who worked on Project 2/Lookback 2.  (ECF No. 83 ¶¶ 18–26).

### 2.  Plaintiffs

The Proposed Collective includes three types of personnel—AMLs, TLs, and QAs—who worked on Project 1/Lookback 2 and Project 2/Lookback 2:  QAs, who reviewed the work that AMLs performed, and TLs, who received instructions from the Contractor Defendants' project managers and supervised QAs and AMLs.  (ECF No. 50 ¶¶ 6, 30).

### a.  Mazzitelli

Mazzitelli's curriculum vitae ("CV") indicates that he is an attorney with "[c]ompliance experience in correspondent, retail and international banking; specializing in [AML], KYC [know-your-customer], fraud investigation and Audit.  Knowledge of the US Patriot Act, Bank Secrecy Act, KYC requirements and Suspicious Activity Reporting (SARs)."  (ECF No. 83-1 at 2).  He received his undergraduate degree from Rutgers University and his law degree from Benjamin N. Cardozo School of Law.  (Id. at 4).  His CV lists several consulting engagements on which he has worked,

---

[4] ECF No. 84-5 is the Declaration of Plaintiff Ricardo Mazzitelli in Opposition to Defendants' Motion for Summary Judgment, dated January 19, 2021.

including for East West Bank, Ernst & Young, JP Morgan Chase, and HSBC USA NA.  (Id. at 2).
Mazzitelli's background check report lists him as self-employed at Mazzitelli Consulting LLC
("Mazzitelli LLC") since 2008.  (ECF No. 83-2 at 3).  Mazzitelli LLC is a New York domestic limited
liability company Mazzitelli formed on June 13, 2011.  (ECF No. 84-2; see ECF No. 1 ¶ 112).

On June 13, 2017, Mazzitelli, through Mazzitelli LLC, entered into a Master Service
Agreement ("MSA") and Statement of Work ("SOW") with GRC to work as a QA on Project
1/Lookback 2 (the "Mazzitelli Agreement").  (ECF Nos. 1 ¶ 112; 50 ¶ 2; 82 at 8; 83-4; 83-5; 83-6).[5]
In the Mazzitelli Agreement, Mazzitelli (defined as "contractor" or "consultant") agreed "to
perform consulting services on an 'as needed' basis as an independent contractor," for which he
would be "paid at a professional hourly rate."  (ECF No. 83-3 at 2).  The Mazzitelli Agreement
contemplated that Mazzitelli's hours would "vary based upon the assigned project, but in most
instances should not exceed forty (40) hours per week."  (Id.)  Mazzitelli was permitted "to
decline any assigned project," and to "provide services to others and through any other person
or entity during those times [he was] not performing work" under the Mazzitelli Agreement.  (Id.
at 3, 4).  An addendum dated the same day as the Mazzitelli Agreement (the "Addendum")
provided that Mazzitelli was the "Contractor who will perform the services," would be paid "$110
per hour on [an IRS Form] 1099 basis," would work at the Bank's offices at 2100 Broadway, New
York City, and would work "[m]inimum 40 hours per week up to estimated 60 hours per week for
estimated 12-20 weeks."  (ECF No. 83-4 at 2; see ECF No. 50 ¶ 23).  The Addendum also noted

---

[5] Although Mazzitelli states in his Declaration that he was a TL on Project 1/Lookback 2, the Contractor
Defendants' exhibits indicate that he was a QA.  (Compare ECF No. 50 ¶ 2 with ECF No. 83-4 at 2).

that the Bank was "open from 8:00AM to 8:00PM weekdays and 8:00AM to 9:00PM weekends, plus additional hours on federal holidays."  (ECF No. 83-4 at 2).

On June 19, 2017, Mazzitelli completed a Form W-9 identifying Mazzitelli Consulting Incorporated ("Mazzitelli Inc."),[6] as the entity to which GRC was to remit payment for his hours worked.  (ECF No. 83-5 at 2).

In September 2017, Mazzitelli and GRC executed a second addendum (the "Second Addendum") reflecting a change in Mazzitelli's role from QA to TL.  (ECF No. 83-6).   On February 25, 2018, Mazzitelli's work on Project 1/Lookback 2 concluded.  (ECF No. 83 ¶ 9; see ECF No. 84-5 ¶ 72).  On his LinkedIn profile, Mazzitelli described his work on Project 1/Lookback 2 as having been on a "contract" basis.  (ECF No. 84-4 at 4).

Mazzitelli states that GRC required him to work, and paid him, through Mazzitelli LLC,[7] and required all AMLs, TLs, and QAs "to have a company" that GRC paid based on the hours they worked.  (ECF No. 50 ¶¶ 4–10).  Mazzitelli states that he worked "exclusively" as a TL, although the Second Addendum indicates he was a QA from June 19, 2017 until September 15, 2017, as noted above.  (Id. ¶ 12; 83-4; 83-6).  GRC monitored his hours, "required" him to work a minimum of 65 hours per week, and throughout his time on Project 1/Lookback 2 he "logged approximately 70 hours each week."  (ECF No. 50 ¶¶ 13, 15, 25).  Because of his long hours, Mazzitelli "could not work in another position" while he was on Project 1/Lookback 2.  (Id. ¶ 29).  Mazzitelli "observed dozens and dozens of TLs, QAs, and AMLs work the same or substantially similar hours as [he] did," and has listed the names of 20 AMLs, three QAs, and three TLs whom he observed

---

[6] On March 3, 2017, Melissa Mazzitelli formed Mazzitelli Inc. in Florida.  (ECF No. 84-3 at 3).
[7] As noted above, Mazzitelli's Form W-9 lists Mazzitelli Inc., not Mazzitelli LLC.  (ECF No. 83-5 at 2).

"work[ing] these long hours."  (Id. ¶ 16).  Neither Mazzitelli nor any other AMLs, QAs, or TMLs who worked "the same long hours" that he did were paid overtime premiums.  (Id. ¶¶ 26–27, 33).  GRC required TLs, QAs, and AMLs to submit their hours through an online portal before GRC paid them.  (Id. ¶ 20).  Mazzitelli states "[u]pon information and belief," that the Contractor Defendants submitted the time records to the Bank for review, and that the Contractor Defendants and the Bank retained copies of TLs, QAs, and AMLs' time records.  (Id. ¶¶ 21–22). GRC "directed and controlled" Mazzitelli's work, and a GRC project manager delivered instructions to TLs, who in turn supervised the AMLs and QAs.  (Id. ¶ 30).

While working on Project 1/Lookback 2, Mazzitelli and the other TLs, QAs, and AMLs used the Bank's "facilities, computers, paper, IT, and information to perform [their] jobs."  (ECF No. 50 ¶ 17).  The Bank was aware of the presence of the TLs, QAs, and AMLs, kept its facility open on weekends, holidays, and after hours, and hired security.  (Id. ¶ 18).  Mazzitelli, and other TLs, QAs, and AMLs, signed the Bank's "acceptable use policy," which governed their use of the Bank's information technology.  (Id. ¶ 19).

Mazzitelli states that, based on his conversations with other AMLs, QAs, and TMLs, they were all also "required to form their own entities, sign virtually identical MSAs, [and] work more than 40 hours a week," without receiving overtime premiums.  (ECF No. 50 ¶ 33).  Mazzitelli became aware of a lawsuit against the Contractor Defendants captioned Damani Bediako v. P&G Auditors & Consultants, LLC, No. 19 Civ. 2527 (SDA) (the "Bediako Action"), another putative collective action seeking to recover overtime wages, discussed further below.  (Id. ¶ 34). Mazzitelli "thought that [he] would have the opportunity to participate in the case," but the

<u>Bediako</u> Action settled before collective notice was distributed, and he did not receive any compensation from that settlement.  (<u>Id.</u>)

On December 7, 2020, Mazzitelli received a packet addressed to Mazzitelli Inc. containing a copy of the Complaint and a letter in which GRC stated its "intent to file claims against Mazzitelli Consulting, Inc. as an 'alter ego of Mazzitelli Consulting LLC.'"  (ECF No. 50 ¶ 37).  Mazzitelli interpreted the letter as an "attempt[] to intimidate [him] and pressure [him] into dropping [his] claims against [GRC]."  (<u>Id.</u> ¶ 38).

### b.  **Curry**

In his CV, Curry describes himself as an "[i]nvestigative professional with 40+ years of combined municipal law enforcement, corporate security and Bank Secrecy Act/Anti-Money Laundering (BSA/AML) investigation experience" who "[p]rovides consulting/investigative expertise and services to financial institutions under regulatory review for compliance and/or policy deficiencies."  (ECF No. 83-7).  He identifies KDC Consulting LLC ("KDC"), a Georgia limited liability company he formed on July 26, 2016, and lists fourteen "BSA/AML/OFAC Engagements" he performed over the preceding eleven years.  (ECF Nos. 84-6; 83-7).

On October 6, 2017, after a background check and an interview with GRC's project manager, Curry, through KDC, entered an MSA with GRC (the "Curry Agreement").  (ECF Nos. 51 ¶¶ 5–8; 83 ¶ 11; 83-8; 83-9).  Curry states that P&G and GRC "required" him to enter the Curry Agreement through KDC, a single-member entity that "has no purpose other than to allow [him] to work on compliance review projects because agencies like GRC, P&G and PGX often require compliance officers/anti-money laundering investigators to form these entities in order to gain employment."  (ECF No. 51 ¶¶ 8–9).  The Curry Agreement, entitled "Master Independent

Contractor Agreement," was materially similar to the Mazzitelli Agreement, contemplating that Curry's hours would "vary based upon the assigned project, but in most instances should not exceed forty (40) hours per week," permitting Curry "to decline any assigned project," and to "provide services to others and through any other person or entity during those times [he was] not performing work" under the Curry Agreement. (ECF No. 83-9 at 2–3, 5). In addition, the Curry Agreement required KDC "to provide proof of professional liability and workers['] compensation coverage," (id. at 3), which Curry provided to GRC. (ECF Nos. 83 ¶ 13; 83-10).

An addendum to the Curry Agreement dated October 9, 2017 (the "Curry Addendum") provided that Curry would perform services as an AML on Project 1/Lookback 2 for a minimum of 40 hours per week up to estimated 60 hours per week for estimated 12-20 weeks until the end of 2017, at a rate of "$75 per hour on 1099 basis." (ECF No. 51-1). Like Mazzitelli's Addendum, the Curry Addendum noted the Bank's extended hours. (Id.) Curry also provided a Form W-9 taxpayer identification form designating KDC as the entity whom GRC was to pay for Curry's hours worked. (ECF Nos. 83 ¶ 14; 83-11). Pursuant to a second addendum dated January 22, 2018, Curry's hourly wage increased from $75 to $90 per hour. (ECF Nos. 51 ¶ 19; 51-2; 84-7; 84-8). On February 18, 2018, Curry stopped providing services on Project 1/Lookback 2. (ECF No. 83 ¶ 15).

In April 2018, PGX solicited summaries of services from professionals in anticipation of Project 2/Lookback 2. (ECF No. 83 ¶ 17). KDC submitted a summary stating that it offered "BSA/AML transactional analysis, auditing, etc." through its "one employee," Curry, who sought $90 to $110 per hour for his services. (ECF No. 83-13 at 2). Curry authorized PGX to perform a background check of KDC. (ECF No. 83-14). On April 26, 2018, KDC entered into an MSA and

SOW with PGX (together, the "KDC-PGX Agreement") providing for KDC to provide "personnel"—designated as Curry—"who will perform the duties of [AML] Investigator" at a rate of $90 per hour on a "1099 basis." (ECF No. 83-15 at 2; <u>see</u> ECF No. 51 ¶ 23). Curry executed the KDC-PGX Agreement as "Owner/President" of KDC. (ECF No. 83-15 at 3). Curry provided services on Project 2/Lookback 2 from April 2018 until August 2018. (ECF Nos. 51 ¶¶ 23, 26; 83 ¶ 20).

Curry states that P&G required him to work more than 40 hours per week, and in fact, he worked a minimum of 65 hours per week. (ECF No. 51 ¶¶ 18, 20–21, 25). His time records indicate that during the week of June 11, 2018, he worked 73 hours, the week of July 16, 2018, he worked 68.5 hours, and the week of July 23, 2018, he worked 76 hours, and the week of July 30, 2018, he worked 67 hours. (ECF Nos. 51 ¶ 22; 51-3). Curry states that the Contractor Defendants "supervised, directed and controlled" the work that Curry and the other AMLs and TLs performed, and reviewed and approved their weekly time sheets. (ECF No. 51 ¶¶ 29–31).

Like Mazzitelli, Curry was required to sign the Bank's "acceptable use policy." (ECF No. 51 ¶ 27). Similarly, Curry also states "[u]pon information and belief" that the Contractor Defendants submitted the AMLs' and TLs' time sheets to the Bank, and both the Contractor Defendants and the Bank retained copies. (<u>Id.</u> ¶¶ 32–33). Curry and other AMLs and TLs "were required to follow [the] Bank's instructions to continue working," and attended staff meetings in which their supervisor "would discuss feedback they received from [the] Bank's employees who reviewed [their] work." (<u>Id.</u> ¶¶ 34–36).

Based on conversations with other AMLs and TLs, seventeen of whom he lists by name, and his knowledge of the <u>Bediako</u> Action, Curry states that they "were all required to work

substantially more than 40 hours a week, and joked about it because nobody was paid overtime premiums . . . ."  (ECF No. 51 ¶¶ 38–40).

### c.  Brown Pilgrim

Brown Pilgrim's CV describes her as having over "28 years of Managerial and Administrative experience in the areas of Banking/Finance Operations, Correspondent Banking, Compliance, OFAC, [BSA], Bank Bribery Act, AML/KYC/CIP/CDD regulations, Financial Investigations, Currency Transaction Reporting (CTR), Customer Due Diligence (CDD)," and several others.  (ECF No. 83-17 at 2).  She lists ten engagements as a forensic investigation analyst over the prior ten years, including for Florida Community Bank, Rabobank NA, Discover Financial Services, and JP Morgan Chase.  (Id. at 2–3).

Like Curry, Brown Pilgrim submitted to PGX a proposal for Project 2/Lookback 2 via Bropil Consulting, LLC ("Bropil"), a three-employee Florida limited liability company Pilgrim formed on August 14, 2013.  (ECF Nos. 83 ¶ 21; 83-16 at 2; 84-12 at 2).[8]  On April 26, 2018, PGX entered into an MSA and SOW with Bropil (together, the "PGX-Bropil Agreement"), which contemplated that Bropil would provide personnel—Brown Pilgrim—as an AML at an hourly rate of $90.  (ECF Nos. 83-18 at 2; 83-19 at 2; see ECF No. 52 ¶¶ 2, 16).  Brown Pilgrim signed the PGX-Bropil Agreement as Bropil's "Managing Partner."  (ECF No. 83-19 at 3).  Brown Pilgrim also authorized PGX to perform a background check of Bropil.  (ECF No. 83-20 at 2).  Brown Pilgrim states that PGX required her, and other AMLs, four of whom she names, to "work" and be paid "through a limited liability company."  (ECF No. 52 ¶¶ 3–5).

---

[8] On December 10, 2020, Pilgrim filed articles of dissolution of Bropil.  (ECF No. 84-12 at 10).

On Project 2/Lookback 2, Brown Pilgrim "worked extremely long hours," as PGX required her to work a minimum of 50–65 hours per week without being paid time and a half for the hours she worked over 40 hours per week. (ECF No. 52 ¶¶ 8, 18). Brown Pilgrim did not work elsewhere for the duration of her assignment to Project 2/Lookback 2. (Id. ¶ 22). Brown Pilgrim "observed dozens and dozens of AMLs work the same or substantially similar hours" as she did, including seven whom she lists by name. (Id. ¶¶ 8–9, 19). Brown Pilgrim and other AMLs submitted their hours to PGX's online portal, after which PGX paid them. (Id. ¶¶ 13, 20). Based on her conversations with other AMLs and TLs, eight of whom she lists by name, Brown Pilgrim states that they "were required to form their own entities, sign virtually identical MSA, work more than 40 hours a week, and were not paid overtime premiums for work in excess of 40 hours per week." (Id. ¶ 25).

Like Mazzitelli and Curry, Brown Pilgrim used the Bank's office resources and was required to sign the Bank's "acceptable use policy." (ECF No. 52 ¶¶ 10, 12). Brown Pilgrim states that the Bank was aware of the AMLs' presence given that they kept the facilities open on weekends, holidays, and after hours, and hired security. (Id. ¶ 11). Like Mazzitelli and Curry, Brown Pilgrim states "[u]pon information and belief" that the Contractor Defendants submitted the AMLs' time sheets to the Bank for review, and that both the Contractor Defendants and the Bank retained copies. (Id. ¶¶ 14–15). PGX and the Bank reviewed and used the work product of Brown Pilgrim and the other AMLs. (Id. ¶ 23).

The Contractor Defendants state that Brown Pilgrim worked on Project 2/Lookback 2 for three weeks in April and May 2018, during which she worked an average of 35.3 hours per week. (ECF No. 83 ¶ 26). Brown Pilgrim terminated the PGX-Bropil Agreement in May 2018. (Id.)

### 3.  **The Bediako Action**

In March 2019, two former AMLs filed the <u>Bediako</u> Action against the Contractor Defendants (but not the Bank) seeking to recover unpaid overtime wages.  (ECF No. 49-3). Additional AMLs joined the <u>Bediako</u> Action as plaintiffs, and in May 2020, thirteen of the AMLs and the Contractor Defendants reached a settlement.  (ECF No. 49-4).  The settlement agreement provided that the Contractor Defendants would transmit the settlement payments to each of the plaintiffs' business entities, did not admit liability, and continued to "believe that at all times all putative class members have been properly classified as independent contractors."  (<u>Id.</u> at 2).  On August 31, 2020, the Honorable Stewart D. Aaron approved the settlement of the <u>Bediako</u> Action. (ECF No. 84-13).

### B.  **Procedural Background**

On August 27, 2020, Plaintiffs filed the Complaint, and this action was designated as related to the <u>Bediako</u> Action.  (ECF No. 1).  On October 15, 2020, the Bank filed its answer and asserted a cross-claim for contractual indemnity against GRC.  (ECF No. 19).  On November 20, 2020, the Court held a telephone conference, following which it granted the Contractor Defendants until December 22, 2020 to answer or otherwise respond to the Complaint, and directed the parties to file by November 30, 2020 a status report regarding their negotiations of a possible tolling agreement.  (ECF No. 36).  The parties were unable to agree to a tolling agreement, although dispute the reasons why.  (ECF Nos. 37–39).

On December 4, 2020, the Bank moved for summary judgment, arguing principally that it was not Plaintiffs' employer.  (ECF Nos. 40–45).  Plaintiffs opposed the Bank's motion, which is now fully briefed.  (ECF Nos. 75–79, 87).  On December 11, 2020, Plaintiffs filed the Collective

Motion.  (ECF No. 48).  On December 21, 2020, the Contractor Defendants filed their answer, in which GRC and PGX asserted crossclaims for breach of contract, indemnification, and fraudulent conveyance against KDC, Curry, Mazzitelli LLC, Mazzitelli Inc., Bropil, Brown Pilgrim, and Dennis Pilgrim.  (ECF No. 60).  On February 16, 2021, the Contractor Defendants filed an amended answer and crossclaims, withdrawing all of GRC's crossclaims, PGX's indemnification claims, and all crossclaims against Mazzitelli LLC and Mazzitelli Inc.  (ECF No. 91).[9]  Following a conference on February 26, 2021, the Court entered a case management plan that set September 30, 2021 as the close of fact discovery, noting that the parties were to initially "focus discovery on information related to and the depositions of" Mazzitelli, Curry, and Brown Pilgrim.  (ECF No. 96). On March 2, 2021, Plaintiffs moved to dismiss PGX's counterclaims.  (ECF No. 97).

On March 5, 2021, the Court adopted the parties' stipulation providing that the claims of the Proposed Collective were tolled from March 8, 2021 to the earlier of oral argument or the Court's decision on the Collective Motion, and that discovery would be stayed for eight weeks while the parties proceeded to private mediation.  (ECF No. 102).  While the action was stayed, eight additional plaintiffs opted into this action.  (ECF Nos. 106, 107, 110–15).

On May 20, 2021, the parties notified the Court that their mediation had not resulted in a settlement.  (ECF No. 116).  On May 21, 2021, the Court lifted the stay, adopted a briefing schedule for Plaintiffs' motion to dismiss PGX's crossclaims, and scheduled oral argument on the Collective Motion.  (ECF No. 117).  On May 27, 2021, the Court heard oral argument on the

---

[9] The crossclaims are as follows:  breach of contract by PGX against KDC; fraudulent conveyance by PGX against KDC and Curry; breach of contract by PGX against Bropil; and fraudulent conveyance by PGX against Bropil, Brown-Pilgrim and Dennis Pilgrim.  (ECF No. 91 ¶¶ 70–105).

Collective Motion.  (ECF minute entry May 27, 2021).  The Court requested certain post-argument

submissions, which the parties filed on May 27, 2021 and June 3, 2021.  (ECF Nos. 118, 121).

### III. LEGAL STANDARD

Section 216(b) of the FLSA provides, in pertinent part:

> An action to recover . . . liability . . . may be maintained against any employer . . .
> by any one or more employees for and in behalf of himself or themselves and
> other employees similarly situated.  No employee shall be a party plaintiff to any
> such action unless he gives his consent in writing to become such a party and such
> consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  While FLSA does not prescribe any procedures for approval of actions brought

collectively by those who are "similarly situated," courts have long construed § 216(b) to grant

district court authority to order that notice be given to potential plaintiffs informing them of the

option to join the suit.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989)

("[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by

facilitating notice to potential plaintiffs."); Braunstein v. E. Photographic Lab'ys, Inc., 600 F.2d

335, 336 (2d Cir. 1978) ("Although one might read the [FLSA], by deliberate omission, as not

providing for notice . . . it makes more sense, in light of the 'opt-in' provision of § 16(b) of the

Act, 29 U.S.C. § 216(b), to read the statute as permitting, rather than prohibiting, notice in an

appropriate case.").  Although orders authorizing notice are sometimes referred to as orders

"certifying" a collective action, FLSA does not contain a certification mechanism.  See Myers v.

Hertz Corp., 624 F.3d 537, 555 n.10 (2d Cir. 2010).  Thus, where a court refers to "certifying" a

collective action, it means only that the court has exercised its discretionary power "to facilitate

the sending of notice" to "similarly situated" individuals.  Id.  The recognition of a collective action

is thus equivalent to a "'case management' tool for district courts to employ in 'appropriate cases.'" Id. (quoting Hoffmann-La Roche, 493 U.S. at 169, 174).

The Second Circuit has approved a two-step process to evaluate whether to approve a collective action. Myers, 624 F.3d at 554–55. First, the court must make "an initial determination [whether] to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs" as to whether the alleged FLSA violation occurred. Id. at 555; Damassia v. Duane Reade, Inc., No. 04 Civ. 8819 (GEL), 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006). A plaintiff must make a "modest factual showing" that he and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)). This standard of proof "cannot be satisfied simply by unsupported assertions." Id. (internal citation omitted); see Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 509 (S.D.N.Y. 2010) (explaining that "plaintiff's supporting allegations must be specific, not conclusory"). At this first stage, the case has not typically "had the benefit of full discovery," and thus courts consider the pleadings as well as supporting affidavits from the named plaintiff to evaluate whether he has made the "modest factual showing" that he is similarly situated to potential opt-in plaintiffs vis-à-vis the defendants' unlawful employment practices. Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475, 480 (S.D.N.Y. 2016); see Almonte v. Marina Ice Cream Corp., No. 16 Civ. 660 (GBD), 2016 WL 7217258, at *1 (S.D.N.Y. Dec. 8, 2016). "For similar reasons, courts do 'not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations' at the first stage." Korenblum, 195 F. Supp. 3d at 480 (quoting In re Penthouse Exec. Club Comp. Litig., No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *2 (S.D.N.Y. Oct. 27, 2010)).

At the second step, on a more complete record following discovery, the district court determines whether a "collective action" may proceed based on the named plaintiff having shown that the plaintiffs who opted in are actually "similarly situated" to him. Korenblum, 195 F. Supp. 3d at 480.  If the court is not convinced, it may "de-certif[y]" the action and dismiss the opt-in plaintiffs' claims without prejudice. Id.

The test for determining whether a named plaintiff is "similarly situated" to other members of the proposed collective is "whether there is a 'factual nexus' between the claims of the named plaintiff and those who have chosen to opt-in to the action." Davis v. Lenox Hill Hosp., No. 03 Civ. 3746 (DLC), 2004 WL 1926086, at *7 (S.D.N.Y. Aug. 31, 2004).  A plaintiff's burden is "minimal." Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 632–33 (S.D.N.Y. 2007).  A plaintiff can satisfy this burden "by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." Realite v. Ark Rest. Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998).

## IV. DISCUSSION

In the Collective Motion, Plaintiffs ask the Court to conditionally certify the Proposed Collective, order Defendants to provide contact information for the members of the Proposed Collective, and equitably toll the statute of limitations for the members of the Proposed Collective.  (ECF No. 53 at 31).  The Contractor Defendants oppose all of this relief principally on the ground that Plaintiffs were independent contractors and were not covered by FLSA, and thus cannot establish that they were similarly situated as to any alleged unlawful employment practices.  (ECF No. 82 at 22–28).  The Bank does not mount arguments on the merits of the Collective Motion, but rather argues that the Collective Motion is premature given the pendency

of the Bank's motion for summary judgment and urges the Court to equitably toll Plaintiffs' claims and delay decision on the Collective Motion "until the 'table' is more fully 'set.'"  (ECF No. 80).

The Court first addresses whether Plaintiffs are similarly situated to the Proposed Collective such that notice is appropriate, and if so, what that notice should contain, before addressing the Bank's argument and Plaintiffs' requests for discovery of contact information and equitable tolling.

### A. Plaintiffs Are Similarly Situated To Other AMLs, TLs, and QAs Who Worked On Both Lookback Projects.

The Contractor Defendants argue that the Collective Motion should be denied because Plaintiffs are independent contractors who are not covered by FLSA and therefore, they cannot establish that there is an "unlawful policy" to which they and the Proposed Collective are "similarly situated."  (ECF No. 82 at 22–23).  The Contractor Defendants ask the Court to consider the "economic realities" of Plaintiffs' relationships to the Contractor Defendants, in particular, the facts that Mazzitelli LLC, KDC, and Bropil were formed before Project 1, and the "time-limited nature of the parties' relationship."  (Id. at 23–24).

The Contractor Defendants' argument invokes a line of precedent in the Second Circuit applying a multi-factor test to determine whether a plaintiff is an employee or an independent contractor.  For context, "[i]n order '[t]o be held liable under FLSA, a person must be an 'employer.'"  Vasquez v. NS Luxury Limousine Serv., Ltd., No. 18 Civ. 10219 (AJN), 2021 WL 1226567, at *4 (S.D.N.Y. Mar. 31, 2021) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)).  An "employer" under FLSA is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is "any individual employed by an employer."  29 U.S.C. §§ 203(d), (e)(1).  The "determination of whether an

employer-employee relationship exists for purposes of [] FLSA should be grounded in 'economic reality rather than technical concepts.'"  Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (citing Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)).

The Second Circuit has used an economic reality test including the factors below to apply these definitions to cases in which defendants argue that plaintiffs were independent contractors:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Zheng v. Liberty Apparel Co., 355 F.3d 61, 67 (2d Cir. 2003) (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–59 (2d Cir. 1988)).  "The existence and degree of each factor is a question of fact," and the "legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law."  Brock, 840 F.2d at 1059; see Thomas v. TXX Servs., Inc., 663 F. App'x 86, 89 (2d Cir. 2016) (noting that economic reality test under Brock is "fact-intensive").

The problem with the Contractor Defendants' argument that Plaintiffs are independent contractors is that, "at the conditional approval stage, 'the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations.'"  Perez Perez v. Escobar Constr., Inc., No. 20 Civ. 8010 (LTS) (GWG), 2021 WL 2012300, at *5 (S.D.N.Y. May 20, 2021) (quoting Lynch v. United Servs. Auto. Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)).  At the conditional approval stage, the Court's focus "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs

are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." Young v. Cooper Cameron Corp., 229 F.R.D. 50, 54 (S.D.N.Y. 2005). There is "ample case law holding that consideration 'of the merits is absolutely inappropriate' at the conditional approval stage." Wood v. Mike Bloomberg 2020, Inc., 484 F. Supp. 3d 151, 158 (S.D.N.Y. 2020); see Fasanelli v. Heartland Brewery, Inc., 516 F. Supp. 2d 317, 322 (S.D.N.Y. 2007) (collecting cases explaining that district court must not resolve factual disputes or resolve issues that go to the merits of plaintiffs' claims at the conditional certification stage); Zhao v. Benihana, Inc., No. 01 Civ. 1297 (KMW), 2001 WL 845000, at *2 (S.D.N.Y. May 7, 2001) (noting that the court "need not evaluate the merits of plaintiff's claims" in deciding whether to grant conditional certification). Therefore, the Contractor Defendants' argument that Plaintiffs are "independent contractors cannot be resolved at this stage, and thus cannot bar the authorization of a notice to the proposed collective." Perez Perez, 2021 WL 2012300, at *5; see Jeong Woo Kim v. 511 E. 5th St., LLC, 985 F. Supp. 2d 439, 447 (S.D.N.Y. 2013) (at conditional approval stage, declining to consider argument that plaintiff was "independent contractor" not an "employee").

Turning to Plaintiffs' submissions in support of the Collective Motion, the Court finds that Plaintiffs have met the "modest" standard for granting conditional collective certification and distribution of notice. Myers, 624 F.3d at 555. The Contractor Defendants required AMLs, TLs, and QAs who worked on Project 1/Lookback 2 and Project 2/Lookback 2 to work through a limited liability company, which was the entity with whom the Contractor Defendants entered the MSAs and transmitted payment to the Plaintiffs and their co-workers. (ECF Nos. 50 ¶¶ 4, 7–10, 20; 51 ¶¶ 8, 11, 19, 23; 52 ¶¶ 3–5). Plaintiffs were required to execute similar MSAs and SOWs that governed their work. (ECF Nos. 51 ¶ 23; 52 ¶¶ 2, 16, 25; 83-8; 83-9; 83-15; 83-18; 83-19). Both

GRC and PGX required Plaintiffs to submit their hours and be paid through an online portal.  (ECF

Nos. 50 ¶ 20; 51 ¶ 13; 52 ¶¶ 13, 20).  Plaintiffs and the other members of the Proposed Collective

performed the same type of work at the same facility of the Bank.  (ECF Nos. 50 ¶¶ 2, 3, 6–11; 51

¶¶ 2-4; 52 ¶¶ 6, 9).  Plaintiffs and the other members of the Proposed Collective had to work in

excess of 40 hours per week, for which they were not paid overtime premiums.  (ECF Nos. 50

¶¶ 13, 16, 24, 33; 51 ¶¶ 12, 18, 20, 28–30; 52 ¶¶ 8–9, 16–18, 20).  Plaintiffs also provide examples

of their own observations as well as the names of other co-workers who experienced the same

working conditions.  (ECF Nos. 50 ¶¶ 7–10; 51 ¶ 38; 52 ¶¶ 9, 20).  Plaintiffs' declarations,

supported by at least some corroborating documentation, satisfies their "modest burden at the

conditional [approval] stage" that they are similarly situated to the members of the Proposed

Collective with respect to Defendants' alleged failure to pay overtime under FLSA.  Contrera v.

Langer, 278 F. Supp. 3d 702, 715 (S.D.N.Y. 2017).

Accordingly, the Court GRANTS Plaintiffs' Collective Motion, to the extent that the Court

authorizes conditional approval of a collective of AMLs, TLs, and QAs who worked on

Project 1/Lookback 2 and Project 2/Lookback 2 within the last three years.

### B. The Pendency of the Bank's Motion for Summary Judgment Does Not Preclude Conditional Approval.

The Bank argues that the Court should refrain from determining the Collective Motion

pending a ruling on its summary judgment motion, citing Lee v. ABC Carpet & Home, 236 F.R.D.

193 (S.D.N.Y. 2006), "so the prospective members of the putative collective and class will know

whether [the] Bank will continue to be a party to this action."  (ECF No. 80 at 2–3).  Plaintiffs

oppose the Bank's argument, and propose that the notice include a statement that the Bank

"disputes its joint employer status and that it has filed a motion for summary judgment seeking to be dismissed from the Action." (ECF No. 90 at 8–9).

As explained in detail above, the Court's focus in deciding the Collective Motion is not the merits of the parties' respective positions, but whether Plaintiffs are similarly situated to the Proposed Collective. The Bank's argument, that conditional approval be put on hold for an indeterminate period while a merits issue awaits resolution, turns the standard on its head and would compromise the efficient progression of this action. See Myers, 624 F.3d at 555 n.10 (describing conditional approval as a "'case management' tool for district courts to employ in 'appropriate cases.'") (quoting Hoffmann-La Roche, 493 U.S. at 169, 174). Furthermore, while the District Court in Lee found that the circumstances of that case warranted keeping the § 216(b) motion on hold for six years until summary judgment was decided, the Court finds in its discretion that the Bank has pointed to no circumstances to justify such a delay in this case. See Hoffmann-La Roche, 493 U.S. at 169 (noting that district courts have "discretion" to determine which cases are "appropriate" for distribution of notice to a conditional collective). The Court noted to the Bank during oral argument that it is a defendant unless and until its summary judgment motion is granted, and therefore, it is correct for the notice to the Proposed Collective to list the Bank as a Defendant. (See ECF No. 119 at 28:15–19). The Plaintiffs have the better suggestion, for the parties to include language in the notice regarding the Bank's motion for summary judgment. Accordingly, the Court rejects the Bank's argument that the Collective Motion is premature.

As to the Bank specifically, Plaintiffs have satisfied their burden to demonstrate that they are similarly situated to the Proposed Collective. They have shown that they and the AMLs, TLs, and QAs all worked at the Bank's 2100 Broadway location, and were required to sign the Bank's

"acceptable use policy," and that the Bank kept its location open to facilitate their work and hired security.  (ECF No. 50 ¶¶ 11, 18, 19; 51 ¶¶ 3, 13, 27; 52 ¶¶ 6, 11).  Indeed, the Bank does not contest that the Plaintiffs are similarly situated to the Proposed Collective.  (See ECF No. 80). Accordingly, the Court finds that it is appropriate for the notice to include reference to the Bank as well.

### C. **The Notice Must Be Amended.**

The Contractor Defendants raise nine "fatal[]" defects in Plaintiffs' Proposed Notice.  (ECF No. 82 at 25–28; see ECF No. 49-5).[10]  These alleged defects are:  (i) improper references to "employment" or "being employed"; (ii) failure to indicate that Plaintiffs or their business entities may be subject to costs and/or crossclaims; (iii) failure to advise Plaintiffs of "potential tax issues"; (iv) failure to advise Plaintiffs of their obligations to participate in the litigation; (v) the collective action period should be measured back from the date of the Notice, not the filing of the Complaint; (vi) the Proposed Notice fails to mention QAs but is also overly broad; (vii) the request to email and text the notice is unwarranted; (viii) failure to state that the Court does not encourage or discourage participation in the litigation; and (ix) the 90-day opt-in period is too long.  (Id.)

The Court has discretion to determine the contents of notice to the Proposed Collective. See Hoffman-La Roche, 493 U.S. at 170 (confirming district courts' discretion to examine and determine contents of notice to collective); Knox v. John Varvatos Enters. Inc., 282 F. Supp. 3d 644, 663–64 (S.D.N.Y. 2017) ("District courts maintain discretion to determine the content of notices sent pursuant to section 216(b)."); Gjurovich v. Emmanuel's Marketplace, Inc., 282 F.

---

[10] The Contractor Defendants mistakenly include two "Seventh" defects.  (ECF No. 82 at 27–28).

Supp. 2d 101, 106 (S.D.N.Y. 2003) (revising language of notice to collective).  In determining the contents of the Proposed Notice in this action, the Court is "guided by the goals of the notice: to make as many potential plaintiffs as possible aware of this action and their right to opt[-]in without devolving into a fishing expedition or imposing undue burdens on the defendants." Elmajdoub v. MDO Dev. Corp., No. 12 Civ. 5239 (NRB), 2013 WL 6620685, at *4 (S.D.N.Y. Dec. 11, 2013) (quoting Guzelgergenli v. Prime Time Specials, Inc., 883 F. Supp. 2d 340, 356 (E.D.N.Y. 2012)).

### 1.  Agreed revisions to the Proposed Notice

On reply, Plaintiffs agree to revise the Proposed Notice to address (iv), (vi), (viii), and (ix) above.  (ECF No. 90 at 10–11).  Accordingly, the Proposed Notice should add:

- A statement that individuals who join as Plaintiffs would be required to participate in discovery and may need to testify at a deposition or at trial (ECF Nos. 82 at 26; 90 at 11);

- QAs as a category of individual to whom the Proposed Notice is sent and who may opt-in to the litigation (ECF Nos. 82 at 27; 90 at 11);

- A statement that the Court neither encourages nor discourages any individual from opting into the litigation as a Plaintiff (ECF Nos. 82 at 28; 90 at 11); and

- A statement that the deadline to opt into the litigation is 60 days from the date of the Proposed Notice.  (ECF Nos. 82 at 28; 90 at 11).  See Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 451–52 (S.D.N.Y. 2011) (collecting cases and holding that 60 days was sufficient opt-in period).

### 2.  Disputed revisions to the Proposed Notice

#### a.  References to employment

The Contractor Defendants object to references in the Proposed Notice to "employment," "being employed," or "firing," citing their dispute that they had "a duty to comply with wage and hour laws" as to Plaintiffs, whom they assert were independent contractors.  (ECF No. 82 at 25).

Plaintiffs do not directly address the references to employment, being employed, or firing, but agree to replace the statement that Defendants "maintain that they have fully complied with all of the federal and state wage and hour laws at issue, and that no current or former employees are legally entitled to any additional compensation," with Defendants "maintain that they properly classified the Plaintiffs and members of the collective as independent contractors and were not under a duty to comply with wage and hour laws." (ECF No. 90 at 10).

The Court suggests that the parties replace language that could be interpreted as conclusive of the disputed factual and legal issues in this case—such as "employment" and "being employed"—with more neutral terminology such as "worked" or "provided services," and to refer to the dates on which Plaintiffs "ceased" or "ended" such work or services instead of "firing" or "termination."

### b.  Costs and crossclaims

The Contractor Defendants argue that the Proposed Notice should inform potential Plaintiffs that they or their business entities may be held liable for costs and may be subject to crossclaims, citing Melgadejo v. S&D Fruits & Vegetables, Inc., No. 12 Civ. 6852 (RA) (HBP), 2013 WL 5951189, at *5–6 (S.D.N.Y. Nov. 7, 2013), in which the court approved a notice containing a similar statement. (ECF No. 82 at 26). Plaintiffs object to the addition of such a statement, arguing that the Contractor Defendants' crossclaims are "attempts to intimidate members of the collective from joining this action" that are "retaliatory and should not be countenanced." (ECF No. 90 at 10).

The problem with Plaintiffs' position is, however, that the Contractor Defendants have asserted crossclaims, and while Plaintiffs have moved to dismiss them, the crossclaims are live in

the case and Plaintiffs will have to defend against them until the District Court rules otherwise. Individuals considering whether to opt-in as plaintiffs should be aware of these possibilities in order to make an informed decision.  And, as noted above, other courts in this District have approved the inclusion in collective notices that opt-in plaintiffs may be subject to costs and counterclaims.  Melgadejo, 2013 WL 5951189, at *5–6 (noting that "standardized template" notice including reference to potential costs and counterclaims had been approved by other courts in this District).  Accordingly, the Court directs that the Proposed Notice include a statement that an individual who opts into the litigation or its business entity may be held accountable for costs associated with the litigation, and may be subject to crossclaims asserted by the Contractor Defendants.

### c.  Potential tax issues

The Contractor Defendants argue that the notice should "advise potential plaintiffs of potential tax issues," citing Brown v. Mustang Sally's Spirits & Grill, Inc., No. 12-CV-529S, 2012 WL 4764585, at *4 (W.D.N.Y. Oct. 5, 2012).  (ECF No. 82 at 26).  Plaintiffs oppose this revision, arguing that there "are no tax consequences for joining the lawsuit."  (ECF No. 90 at 10).

The Court finds that the Contractor Defendants have failed to demonstrate why the Proposed Notice must include a reference to potential tax issues.  The Contractor Defendants fail to elaborate on what these "tax issues" might be, or when they might materialize.  In addition, Plaintiffs are correct that joining the lawsuit as a plaintiff does not itself have tax consequences. Finally, the Contractor Defendants misplace their reliance on Brown, in which the district court was not determining the contents of the notice to a collective, but rather considering the plaintiffs' motion for a preliminary injunction against defendants' communications with potential

opt-in plaintiffs and class members.  <u>Brown</u>, 2012 WL 4764585, at *4.  The court deemed defendants' counsel's statements to plaintiffs' counsel "regarding possible tax implications" if the plaintiffs were to succeed were "of no moment," but did intervene to otherwise limit defendants' counsel's communications with potential opt-in plaintiffs and class members.  <u>Id.</u> The Contractor Defendants do not point to any example of a court in this District approving a statement regarding potential tax consequences, and, accordingly, on the current record, the Court finds that such a statement is not justified.

### d. Collective action period

The Contractor Defendants argue that the Proposed Notice should specify that the collective action period should be measured from the date on which the actual notice is mailed. (ECF No. 82 at 26).  Plaintiffs argue that the collective action period "should be tolled and date back from" the date the Complaint was filed.  (ECF No. 90 at 11).

For the reasons set forth below (<u>see</u> § IV.E <u>infra</u>), the Court finds that equitable tolling is not warranted, and, accordingly, the collective action period shall run from the date on which the notice is distributed, <u>i.e.</u>, the notice shall be distributed to those individuals who performed services on Project 1/Lookback 2 and Project 2/Lookback 2 within three years of the date of the notice.

### e.  Manner of distribution

The Contractor Defendants argue that the circumstances do not warrant distribution of the notice by alternative means.  (ECF No. 82 at 27–28).  Plaintiffs respond that the Contractor Defendants are seeking to "suppress the amount of opt-ins," and that "most people in the 2020's communicate by email and text."  (ECF No. 90 at 11).

Following the precedent of other courts in this District, the Court agrees that disseminating the notice by the additional methods of email and text is appropriate.  See Yi Mei Ke, 19 Civ. 7332 (PAE) (BCM), 2021 WL 148751, at *14 (S.D.N.Y. Jan. 15, 2021) (permitting notice to be distributed by mail, email, text message, and social media chat); Qiang Lu v. Purple Sushi, Inc., 447 F. Supp. 3d 89, 97 (S.D.N.Y. Mar. 19, 2020) (permitting notice to be "disseminated in any relevant language, via mail, email, text message, and social media"); Knox, 282 F. Supp. 3d at 667 (collecting cases authorizing email notice and noting that "email notification is more effective at notifying potential opt-in plaintiffs than mailed notice alone.").  Accordingly, subject to the substantive revisions the Court has authorized to the Proposed Notice, the Court authorizes the notice to be distributed by email and text.[11]

*       *       *

The Court directs the parties to meet and confer to implement the Court's instructions as to the Proposed Notice and by June 28 submit a revised, redlined notice for the Court's review and approval.  See Jason v. Flacon Data Com, Inc., No. 09-CV-03990 (JG) (ALC), 2011 WL 2837488, at *7 (E.D.N.Y. July 18, 2011) (directing parties to meet and confer to revise about changes to notice); Whitehorn, 767 F. Supp. 2d at 452 (directing parties to confer and submit revised notice in accordance with court's instructions); Fasanelli, 516 F. Supp. 2d at 324 (directing plaintiff to revise and resubmit notice).

---

[11] Plaintiffs request, and Defendants do not oppose, distribution of a reminder notice to potential opt-in plaintiffs.  (ECF Nos. 49 ¶ 12; 49-6).  "[M]any courts in this district have permitted sending a reminder notice."  Knox, 282 F. Supp. 3d at 667 (citing Racey v. Jay-Jay Cabaret, Inc., No. 15 Civ. 8228 (KPF), 2016 WL 3020933, at *11 (S.D.N.Y. May 23, 2016)).  Accordingly, the Court permits Plaintiffs to send potential opt-in plaintiffs a reminder notice, revised consistent with the Court's instructions as to the Proposed Notice, 21 days before the opt-in deadline.

### D. **Defendants Must Disclose Contact Information.**

As is typical following a grant of conditional certification of a FLSA collective, the Court will also order Defendants to provide within 15 days of this Opinion & Order a computer-readable list containing, for all AMLs, TLs, and QLs who worked on Project 1/Lookback 2 and Project 2/Lookback 2 for the three-year period before the Complaint was filed:  (i) name; (ii) last known mailing address; (iii) last known telephone number; (iv) email address if known; (v) work location(s); and (vi) dates of employment.  See Garcia, 2016 WL 6561302, at *9 (ordering disclosure of contact information to facilitate notice); Khamsiri, 2012 WL 1981507, at *2 (noting that discovery of contact information is appropriate at the notice stage in FLSA collective actions); Iriarte v. Redwood Deli & Catering, Inc., No. 07-CV-5062 (FB) (SMG), 2008 WL 2622929, at *5 (E.D.N.Y. June 30, 2008) (ordering production of contact information for collective members); Fasanelli, 516 F. Supp. 2d at 324 (same); Cuzco, 477 F. Supp. 2d at 636 (same).

### E. **Equitable Tolling Is Not Warranted.**

Plaintiffs ask the Court to toll the statute of limitations for all potential opt-in plaintiffs until notice is distributed.  (ECF No. 53 at 29–30).  Defendants oppose equitable tolling.  (ECF No. 82 at 28–29).

The statute of limitations for overtime claims under FLSA "is two years unless the violation was willful, in which case the limitations period is three years."  Gaspar v. Pers. Touch Moving, Inc., No. 13 Civ. 8187 (AJN), 2014 WL 4593944, at *6 (S.D.N.Y. Sept. 15, 2014) (citing 29 U.S.C. § 255(a)). The "statute of limitations for opt-in plaintiffs' FLSA claims runs until they actually join the lawsuit; it does not relate back to the filing of the named plaintiff's complaint."  Id. at *7 (citing 29 U.S.C. § 256(b) and Ouedraogo v. A-1 Int'l Courier Servs., Inc., No. 12 Civ 5651 (AJN),

2013 WL 3466810, at *4 n.2 (S.D.N.Y. July 8,2014)).  Although the Second Circuit recently held that, at the pleading stage, mere allegations of willfulness are insufficient for a plaintiff to secure the benefits of the three-year extended limitations period, see Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 320–21 (2d Cir. 2021), the Second Circuit did not elaborate on the significance of its holding with respect to motions for conditional certification under § 216(b).  The Court will therefore continue to follow precedent of other courts in this district that, "where willfulness is disputed, it is appropriate to look to the three-year period in determining the scope of a collective action."  Gaspar, 2014 WL 4593944, at *6 (citing Ouedraogo, 2013 WL 3466810, at *4 n.1). Here, Plaintiffs have alleged that Defendants' violations were willful, (ECF No. 1 ¶¶ 131, 137–38), which Defendants have disputed.  (ECF Nos. 19 ¶¶ 131, 137–38; 91 ¶¶ 131, 137–38).  Therefore, FLSA's three-year limitations period is appropriate for purposes of the Collective Motion.[12]  See Yi Mei Ke, 2021 WL 148751, at *13 (applying three-year limitations period where willfulness was disputed); Taylor v. R.J.T. Motorist Serv., Inc., No. 19 Civ. 01155 (PMH), 2020 WL 4937483, at *4 (S.D.N.Y. Aug. 24, 2020) (applying three-year limitations period); Knox, 282 F. Supp. 3d at 657 (applying three-year limitations period where willfulness was disputed); Gaspar, 2014 WL 4593944, at *6 (same).

The next question is from what date the three-year limitations period runs: the filing of the Complaint, as Plaintiffs argue, or the date notice is distributed, as the Contractor Defendants argue.  In this District, some courts have held that "[n]otice would normally be provided to those employed within three years of the date of the notice."  Taylor, 2020 WL 4937483, at *4

---

[12] The Court acknowledges the Contractor Defendants' reservation of their right to argue in support of summary judgment that the two-year statute of limitations applies.  (ECF No. 82 at 26 n.9).

(emphasis in original). Other courts have calculated the collective period from the date on which the lawsuit was filed, "'with the understanding that challenges to the timeliness of individual plaintiff's actions will be entertained at a later date.'" Yi Mei Ke, 2021 WL 148751, at *14 (quoting Bittencourt v. Ferrara Bakery & Café, Inc., 310 F.R.D. 106, 116–17 (S.D.N.Y. 2015)).

"The doctrine of equitable tolling allows a court to extend a statute of limitations 'on a case-by-case basis to prevent inequity.'" Knox, 282 F. Supp. 3d at 657 (quoting Warren v. Garvin, 219 F.3d 111, 113 (2d Cir. 2000)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). The first prong of the test is concerned "with the diligence of a plaintiff who is seeking the application of" equitable tolling. Contrera, 278 F. Supp. 3d at 724. "The second prong of the equitable tolling test 'is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control.'" Knox, 282 F. Supp. 3d at 657 (quoting Menominee Indian Tribe of Wis. v. U.S., 577 U.S. 250, 257 (2016)). "An extraordinary circumstance might exist if the employee shows that it would have been impossible for a reasonably prudent person to learn of the cause of action . . . or if the defendant concealed from the plaintiff the existence of the cause of action." Whitehorn, 767 F. Supp. 2d at 449.

As to the first prong, Plaintiffs offer no showing in support of the diligence of any members of the Proposed Collective who might seek equitable tolling as to his or her claims. As another court in this District has noted, the equitable tolling inquiry is "a highly factual issue that depends on what and when a plaintiffs knew or should have known—an inquiry that it simply impossible to conduct when opt-in plaintiffs and the facts specific to them have not yet been

revealed." <u>Alvarado Balderramo v. Taxi Tours, Inc.</u>, No. 15 Civ. 2181 (ER), 2017 WL 2533508, at *5 (S.D.N.Y. June 9, 2017); <u>see</u> <u>Hintergerger v. Cath. Health Sys.</u>, No. 08-CV-380S, 2009 WL 3464134, at *15 (W.D.N.Y. Oct. 21, 2009) (denying equitable tolling where plaintiffs did not present "allegations or proof from which this Court can conclude that a reasonably prudent potential plaintiff would not have known of his or her right to receive overtime pay after 40 hours."). Here, Plaintiffs have not identified—nor would the Court expect them to—the individuals who seek equitable tolling or those individuals' circumstances that might justify equitable tolling. Therefore, "this Court cannot assess whether any potential opt-in plaintiff has diligently pursued [his or] her rights," and Plaintiffs' request for equitable tolling must be denied. <u>Knox</u>, 282 F. Supp. 3d at 658.

Given that Plaintiffs have not satisfied the "diligence" prong of the equitable tolling doctrine, it is not necessary for the Court to reach the second prong. <u>See</u> <u>Contrera</u>, 278 F. Supp. 3d at 725; <u>Hintergerger</u>, 2009 WL 3464134, at *15 (denying equitable tolling where plaintiffs failed to show diligence of potential opt-in plaintiffs). The Court nevertheless considers the circumstances that Plaintiffs argue warrant equitable tolling in this action: (i) Defendants' failure to post a notice of rights and provide Plaintiffs with pay notices; (ii) the Contractor Defendants' assertion of crossclaims; and (iii) some Plaintiffs may have been aware of the <u>Bediako</u> Action, which settled before notice was distributed. (ECF No. 53 at 30–31).[13] Plaintiffs have failed to demonstrate that these constitute "rare and exceptional circumstances" as are necessary to justify equitable tolling. <u>Garcia</u>, 2016 WL 6561302, at *10 (denying request for equitable tolling). Even if potentially having to face a counterclaim delayed any plaintiff's decision to opt-in to this

---

[13] Plaintiffs state that "four reasons" justify equitable tolling, but list only three. (ECF No. 53 at 30).

action, it "is not yet clear whether or not any potential plaintiffs will be barred from this action due to a delay in notice." Whitehorn, 767 F. Supp. 2d at 450.  In addition, eight individuals have already opted into this action since the Contractor Defendants filed their crossclaims, raising a plausible inference that the risk of crossclaims has not, across the board, discouraged potential plaintiffs from participating in this action.  (ECF Nos. 106–07, 110–15).  Similarly, the fact that opting into a collective action a plaintiff may subject a plaintiff to cross or counterclaims is a not-uncommon occurrence about which courts have authorized statements in notices.   (See § IV(C)(2)(b) supra).

Accordingly, on the present record, "a categorical ruling tolling the statute of limitations for all opt-in plaintiffs" is not warranted.  Contrera, 278 F. Supp. 3d at 725.  Because the Court has authorized notice to be distributed to a potentially large class of plaintiffs, "the determination as to the timeliness of each future plaintiff's action is better reserved for a future proceeding." Whitehorn, 767 F. Supp. 2d at 450.  Accordingly, Plaintiffs' request for equitable tolling is DENIED "with the understanding that individual plaintiffs may seek such tolling upon demonstrating its applicability" to that plaintiff's circumstances.  Id.

## V. CONCLUSION

For the reasons set forth above, the Collective Motion is GRANTED IN PART and DENIED IN PART as follows:

(1)  Pursuant to 29 U.S.C. § 216(b), the Court conditionally certifies this action as a collective comprised of AMLs, TLs, and QAs who worked on Project 1/Lookback 2 and Project 2/Lookback 2 within three (3) years of the distribution of notice as set forth in paragraph (4) below (the "Collective").

(2) By June 28, 2021, the parties shall meet and confer regarding the Court-ordered changes to the Proposed Notice and submit a revised version for the Court's review and approval.

(3) By June 28, 2021, Defendants shall provide to Plaintiff's counsel, for the members of the Collective, the following information: (i) name; (ii) last known mailing address; (iii) last known telephone number(s); (iv) email address if known; (v) work location(s); and (vi) dates of employment.

(4) Once approved by the Court, the notice and consent form (the "Notice") shall be sent by mail, email, and text to all potential members of the Collective, who must opt-in to this action within 60 days of the date of distribution of the Notice (the "Opt-In Period").  No later than 21 days before the end of the Opt-In Period, Plaintiffs may send a reminder Notice to the Collective.

(5) Plaintiffs' request for equitable tolling is DENIED without prejudice to any individual plaintiff's ability to request tolling on a showing that tolling applies to that plaintiff's particular circumstances.

The Clerk of the Court is respectfully directed to close ECF No. 48.


Dated:        New York, New York
              June 14, 2021


                                        SO ORDERED.

                                        SARAH L. CAVE
                                        United States Magistrate Judge


34